**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| STATE OF TENNESSEE, STATE OF MIS-SISSIPPI, STATE OF ALABAMA, STATE OF GEORGIA, STATE OF INDIANA, STATE OF KANSAS, COMMONWEALTH OF KENTUCKY, STATE OF LOUISIANA, STATE OF NEBRASKA, STATE OF OHIO, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF SOUTH DAKOTA, COMMONWEALTH OF VIR-GINIA, AND STATE OF WEST VIRGINIA, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| *Plaintiffs,* | ) ) | Civil Action No. 1:24-cv-161-LG-BWR |
| v. | ) ) ) | |
| XAVIER BECERRA, in his official capacity as Secretary of the United States Department of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; MELANIE FONTES RAINER, in her official capacity as the Director of the Office for Civil Rights; CENTERS FOR MEDICARE AND MEDI-CAID SERVICES; and CHIQUITA BROOKS-LASURE, in her official capacity as Administrator of the Centers for Medicare and Medicaid Services, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| *Defendants.* | ) | |

---

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR § 705 RELIEF AND A PRELIMINARY INJUNCTION**

---

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ................................................................................................................ 1

BACKGROUND .................................................................................................................. 2

    I.   The Affordable Care Act Prohibits Sex Discrimination. ...................................... 2

    II.  Unproven and Risky Gender-Transition Medical Interventions Stir Debate. ............... 3

        A.  New "gender-transition" protocols emerge. ................................................ 4

        B.  Clinicians and researchers raise concerns about the risks of these interventions.... 5

        C.  States regulate gender-transition interventions to protect their citizens. ................. 5

    III. HHS Imposes Federal Gender-Identity Mandates in Healthcare. ......................... 7

ARGUMENT ...................................................................................................................... 10

    I.   Plaintiffs Are Likely to Succeed on the Merits. ............................................... 10

        A.  The 2024 Rule is contrary to law and exceeds HHS's statutory authority.............. 10

            1. The 2024 Rule unlawfully defines "on the basis of sex." ..................... 11

            2. The 2024 Rule unlawfully regulates the practice of medicine. ........................... 17

            3. The Social Security Act does not authorize rules prohibiting disparate impacts on gender identity. ........................................................................ 19

        B.  The 2024 Rule is contrary to the Spending Clause.................................... 20

        C.  The 2024 Rule is arbitrary and capricious.................................................. 22

    II.  Plaintiffs Will Be Irreparably Harmed Absent Injunctive Relief....................... 22

    III. The Balance of Equities and Public Interest Both Favor Preliminary Relief.............. 25

CONCLUSION..................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                      **Page(s)**

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*,
  57 F.4th 791 (11th Cir. 2022) ........................................................................ 11, 12, 20, 21

*Ala. Ass'n of Realtors v. HHS*,
  594 U.S. 758 (2021) .................................................................................................... 25

*Arangure v. Whitaker*,
  911 F.3d 333 (6th Cir. 2018) ...................................................................................... 11

*Artis v. District of Columbia*,
  583 U.S. 71 (2018) ...................................................................................................... 11

*B.P.J. ex rel. Jackson v. W. Va. State Bd. of Educ.*,
  98 F.4th 542 (4th Cir. 2024) ......................................................................................... 6

*Bostock v. Clayton County, Georgia*,
  590 U.S. 644 (2020) ........................................................................................ 7, 12, 14, 15

*Brawner v. Scott Cnty.*,
  14 F.4th 585 (6th Cir. 2021) ...................................................................................... 12

*Bray v. Alexandria Women's Health Clinic*,
  506 U.S. 263 (1993) .................................................................................................... 16

*BST Holdings v. OSHA*,
  17 F.4th 604 (5th Cir. 2021) ...................................................................................... 25

*Cameron v. EMW Women's Surgical Ctr., P.S.C.*,
  595 U.S. 267 (2022) .................................................................................................... 23

*Career Colleges & Schs. of Tex. v. U. S. Dep't of Educ.*,
  98 F.4th 220 (5th Cir. 2024) ...................................................................................... 10

*City of Arlington v. FCC*,
  569 U.S. 290 (2013) .................................................................................................... 10

*D.H. ex rel A.H. v. Williamson Cnty. Bd. of Educ.*,
  638 F. Supp. 3d 821 (M.D. Tenn. 2022) ............................................................... 11, 13

*Dent v. West Virginia*,
  129 U.S. 114 (1889) .................................................................................................... 17

*Dobbs v. Jackson Women's Health Org.*,
  597 U.S. 215 (2022) ................................................................................................16

*Doe v. BlueCross BlueShield of Tenn., Inc.*,
  926 F.3d 235 (6th Cir. 2019) ....................................................................................2

*Dole v. South Dakota*,
  483 U.S. 203 (1987) ................................................................................................22

*Eknes-Tucker v. Gov. of Ala.*,
  80 F.4th 1205 (11th Cir. 2023)...............................................................6, 14, 15, 16

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ................................................................................................15

*Franciscan All., v. Burwell*,
  227 F. Supp. 3d 660 (N.D. Tex. 2016) ......................................................................7

*Freedom from Religion Found., Inc. v. Mack*,
  4 F.4th 306 (5th Cir. 2021) .....................................................................................25

*Frontiero v. Richardson*,
  411 U.S. 677 (1973) ..................................................................................................3

*Gonzales v. Oregon*,
  546 U.S. 243 (2006) ..........................................................................................17, 18

*Gustafen v. Alloyd Co.*,
  513 U.S. 561 (1995) ................................................................................................19

*Jackson v. Birmingham Bd. of Educ.*,
  544 U.S. 167 (2005) ................................................................................................16

*Kadel v. Folwell*,
  100 F.4th 122 (4th Cir. 2024) .................................................................................14

*Kentucky v. Yellen*,
  54 F.4th 325 (6th Cir. 2022) ..............................................................................20, 21

*L.W. ex rel. Williams v. Skrmetti*,
  83 F.4th 460 (6th Cir. 2023) ............................................................................passim

*La. Pub. Serv. Comm'n v. FCC*,
  476 U.S. 355 (1986) ..........................................................................................10, 17

*Lange v. Houston Cnty.*,
  101 F.4th 793 (11th Cir. 2024)...............................................................14, 15, 16

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ................................................................................................ 22

*Neese v. Becerra*,
  640 F. Supp. 3d 668 (N.D. Tex. 2022) ............................................................. 8, 13

*NFIB v. OSHA*,
  595 U.S. 109 (2022) .............................................................................................. 17

*NFIB v. Sebelius*,
  567 U.S. 519 (2012) .......................................................................................... 21, 22

*Pelcha v. MW Bancorp, Inc.*,
  988 F.3d 318 (6th Cir. 2021) ............................................................................ 12, 13

*Perez v. Mortg. Bankers Ass'n*,
  575 U.S. 92 (2015) ................................................................................................ 22

*R.J. Reynolds Vapor Co. v. FDA*,
  65 F.4th 182 (5th Cir. 2023) ................................................................................ 23

*Russello v. United States*,
  464 U.S. 16 (1983) ................................................................................................ 12

*Tex. Educ. Agency v. U.S. Dep't of Educ.*,
  992 F.3d 350 (5th Cir. 2021) ................................................................................ 21

*Texas v. Becerra*,
  577 F. Supp. 3d 527 (N.D. Tex. 2021) ................................................................. 23

*Texas v. EEOC*,
  633 F. Supp. 3d 824 (N.D. Tex. 2022) ................................................................... 8

*Texas v. United States*,
  787 F.3d 733 (5th Cir. 2015) ................................................................................ 25

*U.S. Forest Serv. v. Cowpasture River Preservation Ass'n*,
  590 U.S. 604 (2020) .............................................................................................. 17

*United States v. Des Moines Nav. & Ry. Co.*,
  142 U.S. 510 (1892) .............................................................................................. 16

*United States v. Texas*,
  97 F.4th 268 (5th Cir. 2024) ................................................................................ 10

*Util. Air Reg. Grp. v. EPA*,
  573 U.S. 302 (2014) ........................................................................................ 10, 17

*Valentine v. Collier,*
    956 F.3d 797 (5th Cir. 2020) .................................................................................23

*West Virginia ex rel. Morrisey v. U.S. Dep't of Treasury,*
    59 F.4th 1124 (11th Cir. 2023) ...................................................................21, 25

*West Virginia v. EPA,*
    597 U.S. 697 (2022) ..........................................................................................12

**Statutes**

5 U.S.C. § 705 ..........................................................................................................10, 25

5 U.S.C. § 706 .....................................................................................................10, 20, 22

20 U.S.C. § 1681 ...........................................................................................2, 11. 12, 13

20 U.S.C. § 1686 ...........................................................................................12, 13, 18, 21

42 U.S.C. § 294e-1(b)(2) ...........................................................................................12

42 U.S.C. § 1396a(a)(4) .............................................................................................19

42 U.S.C. § 1397aa(a) ................................................................................................20

42 U.S.C. § 2000e-2 ...................................................................................................13

42 U.S.C. § 12211 ......................................................................................................17

42 U.S.C. § 18114 ..............................................................................................3, 19, 21

42 U.S.C. § 18116(a) ..............................................................................................2, 11

42 U.S.C. § 18122(1) ...............................................................................................3, 21

42 U.S.C. § 18122(3) ........................................................................................18, 21, 22

Miss. Code Ann. § 41-141-3(d)-(f) .............................................................................6

Miss. Code Ann. § 41-141-5 .......................................................................................6

Tenn. Code Ann. § 68-33-102(5) ................................................................................6

Tenn. Code Ann. § 68-33-103(a)(1) ...........................................................................6

**Rules**

Fed. R. Civ. P. 65(c) ..................................................................................................10

**Regulations**

34 C.F.R. § 106.33-.34 (2023) ........................................................................... 12

34 C.F.R. § 106.41(b) ......................................................................................... 13

45 C.F.R. § 80.8 ................................................................................................... 10

45 C.F.R. § 92.303 ............................................................................................... 10

81 Fed. Reg. 31,376 (May 18, 2016) ............................................................... 3, 7

85 Fed. Reg. 37,160 (June 19, 2020) ................................................................. 22

87 Fed. Reg. 47,824 (Aug. 4, 2022) ............................................................ *passim*

89 Fed. Reg. 37,522 (May 6, 2024) ............................................................. *passim*

89 Fed. Reg. 40,066 (May 9, 2024) ................................................................... 17

**Other Authorities**

U.S. Const. art. I, § 8, cl. 1 ................................................................................ 20

## INTRODUCTION

The Affordable Care Act ("ACA") prohibits discrimination "on the basis of sex" in healthcare by incorporating Title IX's nondiscrimination provision into Section 1557.  In recent years, the Department of Health and Human Services ("HHS") has twice tried to extend that prohibition to encompass gender identity.  Courts ruled both attempts unlawful.  Hoping the third time is the charm, HHS issued a new rule that (again) interprets Section 1557 to include several gender-identity mandates. 89 Fed. Reg. 37,522 (May 6, 2024) ("2024 Rule").  But this rule is as legally flawed as its predecessors, and then some.  The States now seek preliminary relief to prevent the significant and irreparable fallout from HHS's unlawful power grab.

The States satisfy the factors for preliminary relief.  The States are likely to succeed on the merits because the 2024 Rule is plainly unlawful.  Neither Section 1557 nor Title IX's protection for "sex" confers protections for gender identity, period—let alone in the unprecedented manner the 2024 Rule suggests.  Nor do those statutes allow HHS to usurp the States' role as the primary regulator of medicine by saddling States and medical providers with an obligation to permit and provide risky treatments against the weight of medical evidence and judgment.  At minimum, HHS's new mandates cannot pass Spending Clause muster, since the ACA does not unambiguously authorize HHS's new gender-identity mandates and cannot constitutionally coerce States' compliance by threatening to withhold significant portions of their budgets.  And HHS acted arbitrarily and capriciously by, among other things, failing to adequately consider the extent to which its gender-affirming-care mandates undermine the provision of sound medical treatment.

The irreparable-harm implications of HHS's 2024 Rule are staggering.  The Rule will inflict unrecoverable compliance costs and unlawful displacement of the States' duly enacted laws protecting children.  The rule overrides the States' regulation of medical care—a core sovereign function.  It prohibits healthcare facilities from maintaining sex-segregated spaces.  It requires healthcare providers

1

to engage in unproven and risky treatments for gender dysphoria, even if the treatment is against their best medical judgment. It forces States and other insurers to subsidize experimental procedures. And if a State or healthcare provider balks at HHS's gender-identity agenda, they risk losing all federal funding. For the States, the funding loss could amount to *hundreds of billions* of dollars.

The equities and public interest likewise favor temporarily maintaining the status quo pending review of HHS's Rule. HHS cannot credibly claim a need to rush through a mandate based on arguments courts have twice rejected as legally unsound. If anything, the balance of equities favors permitting Plaintiff States to continue enforcing laws that protect vulnerable citizens from risky medical procedures that can inflict life-long harms, including infertility, loss of sexual function, and increased risks of cardiovascular disease and cancer. This Court should grant preliminary relief.

## BACKGROUND

### I.      The Affordable Care Act Prohibits Sex Discrimination.

In 2010, Congress enacted the ACA. That law includes a nondiscrimination provision, commonly referred to as Section 1557, that prohibits discrimination in "any health program or activity, any part of which is receiving Federal financial assistance[.]" 42 U.S.C. § 18116(a). Rather than creating any new bases of unlawful discrimination, "Congress incorporated [into Section 1557] the legal standards that define discrimination under" existing federal laws. *Doe v. BlueCross BlueShield of Tenn., Inc.*, 926 F.3d 235, 238 (6th Cir. 2019). For sex discrimination, Section 1557 cross-references the provisions of Title IX. 42 U.S.C. § 18116(a); *see also* 20 U.S.C. § 1681, *et seq.* (prohibiting discrimination "on the basis of sex" in education context). No other provision in the ACA bars sex discrimination, and nothing in Section 1557 prohibits discrimination on the basis of gender identity.

Section 1557's nondiscrimination mandate applies to what HHS calls "covered entities." Covered entities include hospitals, clinics, and doctors that accept patients paying for services through federal financial assistance programs, as well as state-sponsored health programs that receive federal

2

financial assistance—like Medicaid and the Children's Health Insurance Program ("CHIP").  *See* 89 Fed. Reg. at 37,694.  According to HHS, if "any part" of an entity participates in these financial assistance programs, then the entire entity must comply with Section 1557's restrictions.  *Id.* at 37,693.

When enacting the ACA, Congress explicitly maintained the States' traditional power to regulate the medical field.  *See, e.g.*, 42 U.S.C. § 18122(1) (specifying that nothing in the Act "shall be construed to preempt any State or common law governing medical professional … actions or claims" or "to establish the standard of care or duty of care owed by a health care provider to a patient").  It further limited HHS's ability to interfere with providers' power to practice medicine consistent with their ethical and evidence-based obligations.  For example, "[n]otwithstanding any other provision" of the ACA, HHS "shall not promulgate any regulation" that, inter alia: "impede[s] timely access to health care services"; "interferes with communications regarding a full range of treatment options between the patient and provider"; "restricts the ability of health care professionals to provide full disclosure of all relevant information to patients making health care decisions"; or "violates the principles of informed consent and the ethical standards of health care professionals."  *Id.* § 18114(2)-(5).

## II.    Unproven and Risky Gender-Transition Medical Interventions Stir Debate.

Sex "is an immutable characteristic," *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality), that refers to "male or female according to their reproductive organs and functions assigned by the chromosomal complement," Institute of Medicine, *Exploring the Biological Contributions to Human Health: Does Sex Matter?* 1 n.1 (2001), https://doi.org/10.17226/10028.  By contrast, "gender identity" refers to an "individual's *internal sense* of gender, which may be male, female, neither, or a combination of male and female."  81 Fed. Reg. 31,376, 31,467 (May 18, 2016) ("2016 Rule") (emphasis added).

In rare cases, a person's gender identity does not align with his or her sex.  *See* 87 Fed. Reg. 47,824, 47,831 n.75 (Aug. 4, 2022) ("NPRM").  And in a subset of those few cases, individuals report a "persistent sense of discomfort" caused by that incongruence.  *L.W. ex rel. Williams v. Skrmetti*, 83

F.4th 460, 466-67 (6th Cir. 2023).  This condition is now known as "gender dysphoria."  *Id.* at 466.

While reported rates of gender dysphoria historically have been very low, they have spiked in recent

years—particularly among teens.  *See* Report of Dr. Stephen Levine 13-14, 35, 49 (Feb. 23, 2022) *in*

Attach. to Cmts. of Alliance Defending Freedom, *Factual Evidence*, HHS-OS-2022-0012-68192.  For

children not started down the path to transitioning, gender dysphoria typically resolves during pu-

berty.  *Id.* at 40-42.  Thus, "[w]atchful waiting" has long served as the "standard approach" for ad-

dressing the condition in minors.  *Id.* at 17-19.  Physicians did not offer to minors "what the medical

profession has come to call gender-affirming care" until the late 1990s.  *L.W.*, 83 F.4th at 467.

### A.  New "gender-transition" protocols emerge.

Medical interest groups—like the World Professional Association for Transgender Health

("WPATH") and the Endocrine Society—recently have advocated for treating gender dysphoria in

both adults and children through a protocol of social, chemical, and surgical transition designed to

align their physical appearance and behavior with their gender identity:  so-called "gender-affirming

care."[1]  The gender-transition protocol embraced by these groups proceeds in four escalating steps:

(1) social transition with mental health treatment; (2) puberty blockers (for those who have not com-

pleted puberty); (3) cross-sex hormones; and (4) gender-transition surgery.  *See* Jason Rafferty, et al.,

*Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142 Pe-

diatrics 1, 6-7 (2018); *see* WPATH 7 at 57; WPATH 8 at S258, App'x E.

The "standards" pushed by WPATH have become more aggressive over time.  Compl. ¶¶ 85-

86.  Indeed, WPATH's latest set of "standards" removes *all* minimum-age requirements for cross-sex

hormones and all gender-transition surgeries except for phalloplasty (constructing a penis-like

---

[1] *See* WPATH, *Standards of Care for the Health of Transgender and Gender Diverse People*, Version 8, 28 Int'l J. of
Transgender Health S1 (2022) ("WPATH 8"); WPATH, *Standards of Care for the Health of Transsexual, Transgender,
and Gender-Nonconforming People*, Version 7 (2012), HHS-OS-2022-0012-4074 ("WPATH 7"); Hembree, et al.,
*Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 10
J. Clin. Endocrinol Metab. 3869, 3896 (2017), HHS-OS-2022-0012-4060 ("Endocrine Society Guideline").

structure using skin tissue).  WPATH 8, at S43-79.  According to WPATH, "medically necessary" "gender-affirming surgical procedures," include "[m]astectomy" (removal of breasts), "[o]rchiectomy" (removal of testicles), and "vaginoplasty" (replacing male genitalia with a neovagina constructed from repurposed tissue), to name only a few.  WPATH 8 at S18, S128.  These medical interventions, coupled with other components of WPATH's "gender-affirming" protocol, pose significant health risks and carry lifelong consequences, including sterilization, loss of sexual function, decreased bone density, increased risks of cardiovascular disease and cancer, negative psychological consequences, and a life-long dependence on hormone drugs.  Compl. ¶¶ 87-104.

> **B.  Clinicians and researchers raise concerns about the risks of these interventions.**

"[N]o one disputes" that the above-mentioned treatments for gender dysphoria "carry risks or that the evidence supporting their use is far from conclusive." *L.W.*, 83 F.4th at 489.  As WPATH has acknowledged, "no controlled clinical trials of any feminizing/masculinizing hormone regimen have been conducted to evaluate the safety or efficacy in producing physical transition."  WPATH 7 at 47.  No reliable studies demonstrate that medical gender transition lowers suicide rates, nor is there reliable evidence that medical transition improves long-term mental health relative to other treatments lacking medical risk.  *See* Compl. ¶ 99 (collecting sources).  Even HHS has acknowledged the lack of "high quality evidence" to support the efficacy of gender-transition interventions.  *See id.* ¶ 101.

Given the inherent risks of medical gender transition, researchers and health professionals have expressed increasing concern about allowing adolescents to access these interventions because they often "lack the capacity to consent to such a significant and potentially irreversible treatment." *L.W.*, 83 F.4th at 488.  With increasing frequency, detransitioners have come forward describing their regret for undergoing irreversible transitions.  *Id.* at 487; Levine, *supra*, at 42-45.  And recently leaked internal files from WPATH have only further demonstrated that the group "is neither scientific nor advocating for ethical medical care."  Environmental Progress, *The WPATH Files, Pseudoscientific*

*Surgical and Hormonal Experiments on Children, Adolescents, and Vulnerable Adults* (Mar. 4, 2024), https://perma.cc/4ZCW-FF23. WPATH-affiliated doctors have violated their "ethical requirement to obtain informed consent," with "members admitting that children and adolescents cannot comprehend the lifelong consequences" of "gender-affirming care." *Id.*

Citing these concerning dynamics, some of the same "countries that pioneered these treatments now express caution about them and have pulled back on their use." *L.W.*, 83 F.4th at 477. The "public healthcare entities of Sweden, Finland, France, Australia, New Zealand, and the United Kingdom have raised concerns about the risks associated with puberty blockers and cross-sex hormone treatment and supported greater caution and/or more restrictive criteria in connection with such interventions." *Eknes-Tucker v. Gov. of Ala.*, 80 F.4th 1205, 1218 (11th Cir. 2023). For example, the United Kingdom has restricted puberty blockers after finding the evidence inadequate to conclude they are safe and effective to treat gender dysphoria. *B.P.J. ex rel. Jackson v. W. Va. State Bd. of Educ.*, 98 F.4th 542, 570 n.7 (4th Cir. 2024) (Agee, J., concurring in part and dissenting in part).

**C. States regulate gender-transition interventions to protect their citizens.**

Tracking the developing international consensus, more than twenty States have restricted access to gender-transition interventions for children. *L.W.*, 83 F.4th at 471 (collecting state statutes). For example, in 2023, Tennessee adopted SB1, which prohibits certain medical procedures—including surgeries and hormone treatments—on a minor "for the purpose of" either (1) "[e]nabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex" or (2) "[t]reating purported discomfort or distress from a discordance between the minor's sex and asserted identity." Tenn. Code Ann. §§ 68-33-102(5), 68-33-103(a)(1). Mississippi similarly prohibits such medical procedures on a minor "for the purpose of assisting [that] individual with a gender transition." Miss. Code Ann. § 41-141-3(d)-(f); *see id.* § 41-141-5. And other Plaintiff States have adopted similar restrictions for minors. *See* Compl. ¶¶ 126-28, 130-36.

States also have adopted limitations on the coverage of gender-transition interventions in their Medicaid programs and other state-sponsored health plans.  For instance, Tennessee's Medicaid program and its CHIP program do not cover "sex change or transformation surgery."  *Id.* ¶¶ 111-13.  Subject to limited exceptions, those programs also exclude coverage for "cosmetic surgery or surgical procedures [performed] primarily for the purpose of changing the appearance of any part of the body to improve appearance or self-esteem."  *Id.* ¶¶ 112-13.  Tennessee's state-employee health plan has also long excluded coverage for gender-transition procedures.  *Id.* ¶¶ 114-16.

Mississippi likewise limits access to gender-transition interventions through its state-sponsored health plans.  Mississippi's Medicaid and CHIP programs do not cover procedures "performed primarily to improve physical appearance and/or to treat a mental condition through change in bodily form."  *Id.* ¶¶ 120-21.  They also exclude coverage if the service is "experimental, investigational, or cosmetic in nature."  *Id.*  And the Division of Medicaid is prohibited by statute from "reimburs[ing] or provid[ing] coverage" for certain "gender transition procedures" for minors.  *See id.* ¶ 122.  Additionally, Mississippi's state-employee health plan excludes coverage for "[s]ex transformations" and "[p]uberty-blocking drugs," as well as most "cosmetic services."  *See id.* ¶¶ 123-25.  And other Plaintiff States implement similar exclusions.  *See id.* ¶¶ 126, 129, 132-33, 135.

### III.    HHS Imposes Federal Gender-Identity Mandates in Healthcare.

In 2016, HHS issued a rule interpreting sex discrimination under Section 1557 to encompass discrimination based on "gender identity."  2016 Rule, 81 Fed. Reg. at 31,387-88.  But a federal district court found that interpretation unlawful, concluding that Title IX did not allow HHS's expanded definition of sex discrimination.  *See Franciscan All., v. Burwell*, 227 F. Supp. 3d 660, 687, 689 (N.D. Tex. 2016).  After *Bostock v. Clayton County, Georgia*, 590 U.S. 644 (2020), HHS rolled out a series of guidance documents again interpreting Section 1557 to prohibit discrimination based on "gender identity" and promoting treatment guidelines from the Endocrine Society and WPATH for "children and

adolescents." *See* Compl. ¶¶ 148-50. That effort was also set aside as unlawful after a court recognized that *Bostock* did not support HHS's interpretation. *See Neese v. Becerra*, 640 F. Supp. 3d 668, 675-84 (N.D. Tex. 2022); *see also Texas v. EEOC*, 633 F. Supp. 3d 824, 838, 847 (N.D. Tex. 2022).

Undeterred, on May 6, 2024, HHS finalized the 2024 Rule, renewing its efforts to interpret Section 1557 to protect "gender identity." Without defining "sex," 89 Fed. Reg. at 37,575, HHS interprets "[d]iscrimination on the basis of sex" to include, among other things, discriminating based on "[g]ender identity." *Id.* at 37,699. Threatening the loss of HHS funding for noncompliance, the 2024 Rule also dictates healthcare-facility operations, imposes a national standard of care for gender dysphoria, and requires insurers—including States—to cover so-called "gender-affirming care." *Id.* at 37,701. The 2024 Rule likewise adds controversial prohibitions against discriminating based on gender identity in the Medicaid and CHIP regulations. *Id.* at 37,667-68.

Under the 2024 Rule, no health facility may "[a]dopt or apply any policy or practice" that "prevents an individual from participating in a health program or activity consistent with the individual's gender identity," if doing so causes that individual more than *de minimis* harm. *Id.* at 37,701. And "*de minimis* harm" is a low bar: HHS suggests that merely "experiencing … distress" is enough to cross that threshold. *Id.* at 37,593. For example, according to HHS, refusing to place a male who identifies as a woman in an "intimate space," like a hospital room, with a female "would result in more than *de minimis* harm" and trigger a "violation." *Id.*; NPRM, 87 Fed. Reg. 47,866-67 (same).

And despite the raging debate over the efficacy of gender-transition interventions, the 2024 Rule establishes WPATH's protocol as *the* federal standard of medical care. *See* NPRM, 87 Fed. Reg. at 47,868 & n.423 (asserting covered entities "should follow clinical practice guidelines and professional standards of care" and citing WPATH). The 2024 Rule makes it presumptively discriminatory for covered entities, such as hospitals, clinics, medical practices, and pharmacies, to "[d]eny or limit" puberty blockers, cross-sex hormones, or surgeries "sought for purpose of gender transition," so long

as those entities provide the services for "other purposes." 89 Fed. Reg. at 37,701. For example, if a surgeon performs a mastectomy to treat breast cancer, he is presumptively required to remove healthy breasts for the purpose of "gender transition." *Id.*; *see also* NPRM, 87 Fed. Reg. at 47,867.

A covered entity that refuses to further a patient's gender transition may avoid sanctions only if HHS deems a refusal "clinically appropriate for a *particular individual.*" 89 Fed. Reg. at 37,701 (emphasis added). But HHS views this exception narrowly. *See id.* at 37,607 (suggesting HHS would not require a doctor to provide "a prostate exam for a transgender man who does not anatomically have a prostate"). And the rule's requirement of "*individualized* clinical judgment," *id.* at 37,575, 37,595-97 (emphasis added), precludes any general policy against gender-transition interventions based on concerns about the efficacy and safety of those procedures. *See id.* at 37,613 (suggesting that non-WPATH standards "may be considered evidence of pretext for discrimination"). Providers may not even refer to gender-transition interventions as "experimental or cosmetic … because this characterization is not based on current standards of medical care," as established by WPATH. NPRM, 87 Fed. Reg. at 47,874 *c.f. id.* at 47,868 & n.423 (citing WPATH's standards as "clinical practice guidelines and professional standards of care"). Even a provider who declines treatment to minors under state laws prohibiting such treatment would engage in "prohibited discrimination on the basis of sex" under the rule. *Id.*; *see* 89 Fed. Reg. at 37,535 (purporting to "preempt" any conflicting state law).

The 2024 Rule also requires States and insurers to subsidize gender transitions. *See* 89 Fed. Reg. at 37,701. According to HHS, it is presumptively discriminatory for covered insurers—including States—to deny or limit "coverage of a claim," or impose "additional cost sharing or other limitations or restrictions on coverage, for specific health services related to gender transition" if doing so "*results in* discrimination on the basis of sex." *Id.* (emphasis added); *see also id.* at 37,691 (requiring Medicaid service contracts to prohibit policies or practices with a discriminatory "effect" on "gender identity"). And while an insurer or State may avoid sanctions by showing that there was no "medical necessity"

in a particular case, the 2024 Rule prohibits a "categorical coverage exclusion … for all health services related to gender transition."  *Id.* at 37,701.  Failing to comply with the 2024 Rule puts the States' federal funding at risk, including Medicaid funding.  45 C.F.R. §§ 80.8, 92.303.

## ARGUMENT

Plaintiffs seek a preliminary injunction and relief pending review under 5 U.S.C. § 705.  Both routes to relief allow a court to "preserve status or rights pending" completion of the proceedings by pausing the effect of an agency action.  5 U.S.C. § 705; *see also* Fed. R. Civ. P. 65(c).  Courts consider four factors in determining whether preliminary relief is appropriate: (1) whether the moving party has shown a likelihood of success on the merits; (2) whether the moving party will be irreparably injured absent an injunction; (3) whether issuing an injunction will harm other parties to the litigation; and (4) whether an injunction is in the public interest.  *United States v. Texas*, 97 F.4th 268, 274 (5th Cir. 2024) (citation omitted); *see also Career Colleges & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 233, 255-56 (5th Cir. 2024) (granting relief under 5 U.S.C. § 705).  Each factor supports relief here.

## I.     Plaintiffs Are Likely to Succeed on the Merits.

### A.  The 2024 Rule is contrary to law and exceeds HHS's statutory authority.

A federal agency's "power to act and how [it is] to act is authoritatively prescribed by Congress."  *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013).  Thus, "an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate."  *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 328 (2014).  Nor may an agency "confer power upon itself."  *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).  Yet, in the 2024 Rule, HHS attempts to shoehorn "gender identity" into Section 1557's prohibition against *sex* discrimination, and it attempts to pervasively regulate the practice of medicine—a matter within the traditional authority of the States—without congressional authorization.  Because the 2024 Rule exceeds HHS's "statutory jurisdiction [or] authority" and is "otherwise not in accordance with law," it should be set aside.  5 U.S.C. § 706(2)(A), (C).

### 1. The 2024 Rule unlawfully defines "on the basis of sex."

**1.** The 2024 Rule exceeds HHS's statutory authority because it regulates based on the view that "on the basis of sex" protects gender identity. Neither Section 1557 nor Title IX mentions "gender identity" as a protected category. Instead, Congress expressly limited the statutes' coverage to discrimination "on the basis of *sex*." 42 U.S.C. § 18116(a) (incorporating 20 U.S.C. § 1681, *et seq.*). And "traditional tools of statutory interpretation" uniformly confirm that conflating "gender identity" with "sex" is "contrary to the clear meaning of" Title IX. *Arangure v. Whitaker*, 911 F.3d 333, 336 (6th Cir. 2018) (quotations omitted). As evidenced by dictionary definitions at the time of Title IX's enactment—coupled with the novelty of the term "gender identity" in the early 1970's, *see* Compl. ¶¶ 51, 54—the "ordinary meaning" of "sex" in Title IX clearly refers to the biological binary of "male" and "female." *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812 (11th Cir. 2022) (collecting definitions); *see also Artis v. District of Columbia*, 583 U.S. 71, 83 (2018) (requiring courts interpreting a statutory provision to "giv[e] the words used their ordinary meaning").

As numerous courts have recognized, Title IX allows sex-based distinctions when the sexes are not similarly situated and allows the application of sex-based policies to transgender persons. *Adams*, 57 F.4th at 812-15; *D.H. ex rel A.H. v. Williamson Cnty. Bd. of Educ.*, 638 F. Supp. 3d 821, 835-36 (M.D. Tenn. 2022). It makes perfect sense to import that understanding of "sex"—and sex discrimination—into Section 1557 because, much like in the educational context where differential treatment based on sex may be warranted (e.g., facilities, sports teams), healthcare also implicates different risks and treatments based on biological realities that differ between men and women.

Consider *Adams*. The transgender plaintiff there argued that separating bathrooms based on sex, and thus denying access to a bathroom consistent with an individual's "gender identity," was discriminating based on sex under Title IX. 57 F.4th at 811. But the court explained that "the statutory context of Title IX" required a different result. *Id.* at 813. For example, conflating "sex" with

"gender identity" would "render[] meaningless" Title IX's express allowance of "'separate living facil-ities for the different sexes'" because "transgender persons—who are members of the female and male sexes by birth—would be able to live in *both* living facilities associated with their biological sex and living facilities associated with their gender identity or transgender status." *Id.* (quoting 20 U.S.C. § 1686). "That conclusion cannot comport" with Title IX. *Id.* at 814. The same would go for the many sex-based distinctions appearing throughout Title IX and the original implementing regulations. *See, e.g.*, 20 U.S.C. § 1681(a)(6)-(9); 34 C.F.R. § 106.33-.34 (2023).

Structural features of the ACA further undermine HHS's interpretation. For example, the statute elsewhere references "different genders and sexual orientations," *see* 42 U.S.C. § 294e-1(b)(2), signaling that if Congress wished to prohibit gender-identity discrimination in Section 1557, it knew how to do so.[2] *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

**2.** The 2024 Rule nonetheless states that "sex" discrimination prohibited by Title IX—and incorporated into Section 1557—includes discrimination based on "gender identity." 89 Fed. Reg. 37,698-99. HHS relies on *Bostock* for this result. But *Bostock* was a narrow decision limited to Title VII that expressly declined to "prejudge" other nondiscrimination laws, like Title IX and Section 1557, or whether its ruling affected common practices like sex-separated "bathrooms." 590 U.S. at 681. "[T]he Court in *Bostock* was clear on the narrow reach of its decision and how it was limited only to Title VII itself." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) (declining to apply *Bostock*

---

[2] Having flunked every traditional tool of statutory interpretation, HHS's misinterpretation of Title IX and Section 1557 cannot be saved by *Chevron* deference. HHS's reading falls outside the range of reasonable inter-pretations of the statutory text because it purports to resolve a policy issue of major political significance with-out clear congressional authority, *see West Virginia v. EPA*, 597 U.S. 697, 721-24 (2022), and it fails to construe "on the basis of sex" "to avoid serious constitutional doubts," *Brawner v. Scott Cnty.*, 14 F.4th 585, 592 n.2 (6th Cir. 2021) (citation omitted). Also, *Chevron* was wrongly decided. *See Loper Bright Enters. v. Raimondo* (U.S., No. 22-451) (argued Jan. 17, 2024) (reconsidering *Chevron*).

to the "because of" nondiscrimination provision in the Age Discrimination in Employment Act). Thus, courts have declined to extend *Bostock* beyond its narrow holding.  *See, e.g.*, *id.*; *L.W.*, 83 F.4th at 484; *Neese*, 640 F. Supp. 3d at 676.

That makes sense.  The legal theory of *Bostock* is inapposite to the "discrimination" inquiry presented in Title IX.  Whereas Title VII prohibits certain actions "because of … sex," full stop, 42 U.S.C. § 2000e-2, Title IX explicitly *permits* separation "on the basis of sex" in numerous circumstances, 20 U.S.C. § 1681(a)(1)-(9).  Indeed, Title IX states that its prohibition on "discrimination" "on the basis of sex," *id.* § 1681(a), shall not be construed to prohibit the "maintain[ance of] separate living facilities for the different sexes," *id.* § 1686.  And Title IX's implementing regulations specifically *allow* institutions to "operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill," like golf, "or the activity is a contact sport."  34 C.F.R. § 106.41(b).  "Title IX is clear that not all *differentiation* based on sex is impermissible *discrimination*." *D.H.*, 638 F. Supp. 3d at 835 (emphasis added).

HHS cannot avoid this outcome by arguing that by referencing "the *ground* prohibited under … title IX," Section 1557 adopts only the provision barring sex discrimination, divorced from the bevy of surrounding provisions that allow for differential treatment of the sexes, *see* Compl. ¶¶ 52-53 (collecting cites), defining what sex discrimination means in context.  *See* NPRM, 87 Fed. Reg. at 47,839 (emphasis added).  For one, by using "et seq." when incorporating Title IX, Congress clearly intended Section 1557 to incorporate all of Title IX.  *Et seq.*, Black's Law Dictionary (11th ed. 2019) ("And those (pages or sections) that follow").  Second, Title IX's separate provisions (like 20 U.S.C. § 1686) inform how courts construe what constitutes sex discrimination under the statute.  And third, HHS acknowledges that Section 1557 "incorporate[s] existing interpretations or what constitutes sex discrimination under title IX, including … case law," like *Adams*, *Neese*, and *D.H.*, that have concluded that gender identity is not covered by Title IX.  89 Fed. Reg. at 37,638.

13

HHS also errs in invoking *Bostock*'s proposition that "discrimination based on … transgender status necessarily entails discrimination based on sex." 590 U.S. at 669; 89 Fed. Reg. at 37,573-75. HHS's position actually rests on the inverse of *Bostock*: Their argument is not that "discrimination based on … transgender status necessarily entails discrimination based on sex," *id.*, but that recognition of biological sex differences "necessarily entail[]" discrimination based on transgender status. Under basic logic, the fact that B follows A (A→B) does not mean that A follows B (B→A). And nothing in *Bostock*—or in Title IX—supports the logically distinct and clearly flawed theory that any action that takes into account biological sex differences necessarily takes cognizance of gender identity.

**3.** But even if Section 1557 incorporates only Title IX's prohibition against discrimination "on the basis of sex" and not its other provisions, and even if *Bostock* bore on the meaning of that statutory phrase, the 2024 Rule would still fail. *Bostock* reiterated what blackletter discrimination law holds: "To 'discriminate against' a person" is "treating that individual *worse* than others *who are similarly situated*." 590 U.S. at 657 (emphasis added). There, the Court assessed an employee's termination "simply for being … transgender." *Id.* at 650. Being fired is a quintessential form of worse treatment, so "discrimination" was a given. The "similarly situated" prong was likewise satisfied, given the Court's conclusion that "[a]n individual's homosexuality or transgender status is not relevant to employment decisions" about hiring and firing. *Id.* at 660.

By contrast, a State plainly does not "discriminate" based on sex—*i.e.*, treat any person worse than a similarly situated comparator—when it forbids hormonal treatments and surgeries for the purpose of gender transition. *See L.W.*, 83 F.4th at 480-83; *Eknes-Tucker*, 80 F.4th at 1228; *see also Lange v. Houston Cnty.*, 101 F.4th 793, 803 (11th Cir. 2024) (Brasher, J., dissenting); *Kadel v. Folwell*, 100 F.4th 122, 171-74, 177 n.19 (4th Cir. 2024) (Richardson, J., dissenting). The availability of these interventions instead turns on "the risk-reward assessment of treating this medical condition (as opposed to another) with these procedures." *L.W.*, 83 F.4th at 483. A restriction on access to gender-transition

14

interventions does not "establish an unequal regime for males and females" because it "applies equally to both sexes." *Eknes-Tucker*, 80 F.4th at 1228.

For example, a provider who performs a mastectomy to treat breast cancer but refuses to remove healthy breast tissue from a woman who identifies as a man is acting based on the patient's differential medical condition or diagnosis, not sex. Put differently, removing cancer tissue is not "to [the doctor's mind], materially identical in all respects" to removing healthy tissue for the purpose of gender transition. *Bostock*, 590 U.S. at 660. That is because in medicine, as in pharmacy, the "therapeutic purpose" is material to a course of treatment. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 142-43 (2000). Because the medical diagnoses are different, not materially identical, there is no intentional sex discrimination. *See Eknes-Tucker*, 80 F.4th at 1228. For purposes of these medical treatments, females who identify as males are not "similarly situated" to males, and males who identify as females are not "similarly situated" to females, so there is no discrimination.

Insurers may have another reason to refuse to cover gender-transition interventions. "Sex change surgeries are a suite of medical procedures that can vary in their purpose, cost, and complexity." *Lange*, 101 F.4th at 802 (Brasher, J., dissenting). Given the high costs of these procedures—particularly when performed for the purposes of gender transition—insurers, including States, can make the rational decision to "cover[] medically necessary treatments but exclude[] particularly expensive, top-of-the-line procedures." *Id.* In that case, an individual's "sex is not relevant to the [State's] insurance at all. All that matters is whether [the individual] is asking the insurer to pay for a constellation of medical procedures known as a 'sex change.'" *Id.* at 804. Moreover, the "constellation of procedures that are needed for a male-to-female sex change are unique and not medical procedures that a natal woman could ever undergo." *Id.* at 806 (explaining a "vaginoplasty" performed on a natal man is different in kind from a vaginoplasty performed on a natal woman). So "changing the [individual's] sex" would not "yield[] a different" coverage choice by the insurer—meaning such a policy

passes *Bostock*'s "simple test" for discrimination.  *See id.* (citations omitted).

Nor is it relevant that "transgender individuals [purportedly] are the only individuals who seek transition-related care."  NPRM, 87 Fed. Reg. at 47,871.  Title IX prohibits only "intentional sex discrimination."  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005).  "[T]he regulation of a course of treatment that only gender nonconforming individuals can undergo" does not discriminate based on "sex" "unless the regulation were a pretext for invidious discrimination against such individuals."  *Eknes-Tucker*, 80 F.4th at 1229-30; *see also Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 236 (2022).  But gender-transition interventions are not "such an irrational object of disfavor" that there must be intentional discrimination on the basis of gender nonconformity.  *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993); *see United States v. Des Moines Nav. & Ry. Co.*, 142 U.S. 510, 544 (1892) (recognizing presumption of good faith).

"The unsettled, developing, in truth still experimental, nature of treatments in this area surely permits more than one policy approach."  *L.W.*, 83 F.4th at 488.  That is even more true as evidence mounts against the safety and efficacy of these interventions.  Compl. ¶¶ 87-104.  And where, as here, State health plans cover certain treatments for gender dysphoria—e.g., psychological treatment—there is "a reasonable inference that there is a 'but for' cause *other than transgender status* for the plan to decline coverage" for expensive and risky interventions.  *Lange*, 101 F.4th at 805 (Brasher, J., dissenting).  In other words, "the plan draws the line between sex-change [interventions]" and other procedures, not "between procedures transgender people need and procedures that other people need."  *Id.*

In sum, the 2024 Rule's redefinition of sex discrimination in Section 1557 to encompass "gender identity" has no basis in the statutory text.  *Bostock* lends HHS no support.  And the 2024 Rule's "sex-classification argument … does not work on its own terms."  *L.W.*, 83 F.4th at 483.  Thus, the 2024 Rule can only be understood as promoting the Biden Administration's policy priority to read "gender identity" protections into nondiscrimination provisions at all costs.  *See also, e.g.*, 89 Fed. Reg.

40,066, 40,068-69 (May 9, 2024) (HHS rule holding that gender dysphoria constitutes a disability under the Rehabilitation Act (which is also incorporated into Section 1557), even though that statute *explicitly* excludes from its scope "transsexualism" and "gender identity disorders not resulting from physical impairments," 42 U.S.C. § 12211). But "an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate," *Util. Air Reg. Grp.*, 573 U.S. at 328. The States are thus likely to succeed in invalidating the 2024 Rule.

### 2. The 2024 Rule unlawfully regulates the practice of medicine.

"[F]rom time immemorial," the States have maintained primary responsibility for regulating the medical field through constitutionally reserved powers to protect their citizens' health and welfare. *Dent v. West Virginia*, 129 U.S. 114, 122 (1889); *see NFIB v. OSHA*, 595 U.S. 109, 121 (2022) (Gorsuch, J., concurring). So, if Congress "wishes to significantly alter the balance between federal and state power" to regulate medicine, it must use "exceedingly clear language," *U.S. Forest Serv. v. Cowpasture River Preservation Ass'n*, 590 U.S. 604, 622 (2020), not "muffled hints," *Gonzales v. Oregon*, 546 U.S. 243, 274 (2006). But Section 1557—a nondiscrimination provision—does not clearly grant HHS authority to impose the 2024 Rule's edicts regulating how covered health entities run their facilities or how providers care for their patients. Instead, HHS has unlawfully "confer[red] power upon itself," *La. Pub. Serv. Comm'n*, 476 U.S. at 374.

With no statutory hook whatsoever, the 2024 Rule purports to superintend key aspects of medical practice while ousting States from their traditional role as regulators of the medical profession and medical ethics. For example, the rule imposes a *de minimis* harm standard malleable enough that providers cannot "refuse to place [a transgender person] in facilities consistent with their gender identity." 89 Fed. Reg. at 37,593. In other words, the 2024 Rule prohibits hospitals from maintaining sex-separated "intimate space[s]," *id.*, preferencing alleged harm to transgender patients over any adverse impact to those individuals whose intimate spaces have been invaded, and despite Title IX's explicit

authorization of sex-separated spaces, 20 U.S.C § 1686.  The rule's lax *de minimis* harm standard also risks punishing doctors who decline to give medically unsound care if that refusal causes the patient "distress."  *See* Compl. ¶ 257.

The upshot is that the 2024 Rule imposes a national standard of care for gender dysphoria without congressional authorization.  *Id.* ¶ 260.  It mandates that nearly all doctors nationwide provide treatments pushed by an international organization recently shown to lack scientific and ethical rigor. *Id.*  Providers are prohibited from exercising their own reasonable medical judgment about the appropriateness and safety of sex-transition procedures generally, nor can they decline to provide sex-transition procedures based on the experimental nature of those procedures.  *Id.*  Instead, the 2024 Rule would deem doctors guilty of sex discrimination simply for hewing to well-settled and scientifically grounded understandings about "sex" and the attendant medical consequences.  *Id.* ¶¶ 257-58.  And by chilling providers from engaging in lines of inquiry with patients necessary to provide effective care, the 2024 Rule also invades the doctor-patient relationship.  *Id.* ¶ 259.

Making matters worse, the 2024 Rule's gender-transition mandate purports to nullify contrary state laws limiting the provision of gender-transition medical interventions to minors.  *See* 89 Fed. Reg. at 37,535, 37,598.  At the same time, the ACA explicitly protects state tort laws from preemption.  42 U.S.C. § 18122(3).  This puts providers in an impossible position.  If they adhere to their medical judgment that gender-transition interventions are inappropriate, they will lose HHS funding, but if they accede to the 2024 Rule's gender-affirming-care mandates, they open themselves to extensive malpractice liability.  So, providers will be forced to pick their poison: lose HHS funding, or funnel the funding they receive to a team of civil defense lawyers.

Nothing in Section 1557 authorizes this "radical shift of authority from the States to the Federal Government" on what constitutes sound medical practice.  *Gonzales*, 546 U.S. at 275.  If anything, the 2024 Rule contradicts Section 1554 of the ACA, which *prohibits* HHS from interfering with

providers' practice of medicine.  Section 1554 bars HHS from adopting any rule that "impede[s] timely access to health care services"; "interferes with communications regarding a full range of treatment options between the patient and the provider"; "restricts the ability of health care professionals to provide full disclosure of all relevant information to patients making health care decisions"; or "violates the principles of informed consent and the ethical standards of health care professionals."  42 U.S.C. § 18114(2)-(5).  Yet, the 2024 Rule would require providers to cede their reasoned medical judgment to the controversial positions of gender-transition advocates like WPATH, even if doing so would mislead patients about the efficacy of these treatments.  Compl. ¶¶ 178-88.

The 2024 Rule cannot permissibly commandeer medical care along HHS's preferred ideological lines.  The States are likely to succeed in invalidating the 2024 Rule on this independent basis.

### 3. The Social Security Act does not authorize rules prohibiting disparate impacts on gender identity.

In addition to purporting to implement Section 1557, the 2024 Rule also amends the standard contract requirements under Medicaid and CHIP to require prohibiting any policy or practice that has the "effect of discriminating" based on an individual's "gender identity."  89 Fed. Reg. at 37,691.  According to HHS, these changes to the CMS regulations are authorized by the Social Security Act ("SSA"), another Spending Clause statute.  Not so.

The SSA requires State plans to provide "such methods of administration … as are found by the Secretary to be necessary for the proper and efficient operation of the plan."  42 U.S.C. § 1396a(a)(4).  Nothing in that statute's plain text supports HHS's gender-identity rules.  The phrase "methods of administration" surely does not do so.  The 2024 Rule's gender-identity mandates are nothing like the administrative tasks identified in Section 1396a(a)(4), like setting "personnel standards," providing for "utilization of professional medical personnel," and "ensur[ing] necessary transportation for beneficiaries."  A word is known by the company it keeps, *Gustafen v. Alloyd Co.*, 513 U.S. 561, 575 (1995), and the company of "methods of administration" confirms the absence of statutory

authority.  At minimum, States lacked "clear and unmistakable" notice that HHS could impose its gender-identity mandate on contractors through language on "methods."  *Kentucky v. Yellen*, 54 F.4th 325, 354 (6th Cir. 2022).

Nor does 42 U.S.C. § 1397aa authorize HHS's gender-identity mandate for CHIP.  This provision merely states that the "purpose of" the CHIP program "is to provide funds to States to enable them to initiate and expand the provision of child health assistance … in an effective and efficient manner."  42 U.S.C. § 1397aa(a).  It does not grant HHS rulemaking authority or otherwise support HHS's interpretation of "sex" discrimination to include gender identity—certainly not clearly.  *Adams*, 57 F.4th at 815.  Nor has HHS articulated how its gender-identity mandates would make the CHIP program more "effective and efficient."  42 U.S.C. § 1397aa(a).  Logic suggests that added layers of bureaucracy and disparate-impact requirements have the opposite effect.  Because the 2024 Rule's interpretations of the relevant provisions contravene the statutory text and bedrock canons of statutory interpretation, it should be declared unlawful and set aside.  *See* 5 U.S.C. § 706(2).

### B.  The 2024 Rule is contrary to the Spending Clause.

The APA requires courts to set aside and vacate agency action that is "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).  And if Section 1557 allows what the 2024 Rule says, then there is a serious Spending Clause problem.  *See* U.S. Const. art. I, § 8, cl. 1.

Spending Clause legislation—like Section 1557—"is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions."  *Adams*, 57 F.4th at 815 (citation omitted).  But "if Congress intends to impose a condition on the grant of federal moneys [under Spending Clause authority], it must do so unambiguously."  *Id.* (citation omitted).  This "clear-statement rule" applies with special strength when a federal-funding condition "encroache[s] upon a traditional state power," such as the regulation of healthcare.  *Yellen*, 54 F.4th at 354.

Nowhere in Section 1557, Title IX, the SSA, or anywhere else has Congress set out "clear and

unmistakable" authorization for HHS to regulate "nondiscrimination" based on gender identity.  *Id.*  Nor does that legislation "unambiguously" condition the grant of federal money on acceptance of the 2024 Rule's sweeping gender-identity mandates.  *See Adams*, 57 F.4th at 815.  Congress did not prohibit healthcare facilities from maintaining sex-segregated spaces by incorporating Title IX—which explicitly *permits* sex-segregated spaces, *see, e.g.*, 20 U.S.C. § 1686.  It did not mandate that the vast majority of the country's doctors follow the non-evidence-based WPATH standards.  *See* 42 U.S.C. § 18114 (prohibiting HHS from imposing any such requirement).  And it did not command States to abandon their traditional sovereign authority over the practice of medicine, let alone affirmatively undermine that authority by subsidizing treatments that a State has determined are harmful.  *See id.* § 18122(1), (3) (prohibiting HHS from establishing standards of care or preempting "State or common law governing medical professional … liability actions or claims").

HHS's 2024 Rule itself cannot provide notice to satisfy the Spending Clause clear-statement rule, as the necessary "clear statement … must come directly from the statute."  *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 361 (5th Cir. 2021).  Courts throughout the country have rejected attempts by the federal government to modify the terms of the Spending Clause "contract" by imposing new obligations on States found nowhere in statutory text.  *See id.*; *West Virginia ex rel. Morrisey v. U.S. Dep't of Treasury*, 59 F.4th 1124, 1147 (11th Cir. 2023); *Yellen*, 54 F.4th at 353-54.

In any event, the 2024 Rule separately violates the Spending Clause by placing a "gun to the head" of the States.  *NFIB v. Sebelius*, 567 U.S. 519, 581 (2012) (plurality opinion).  The Supreme Court has recognized that the Spending Clause prevents Congress from offering a "financial inducement" that is "so coercive as to pass the point at which 'pressure turns into compulsion.'"  *Dole v. South Dakota*, 483 U.S. 203, 211 (1987) (citation omitted).  If that anti-coercion limit prevents anything, it prevents the conditioning of more than $100 billion in federal funding for Plaintiff States—amounts representing large portions of their overall budgets, *see infra* p. 23—on their ceding their longstanding

power to regulate permissible medical procedures and, indeed, facilitating controversial treatments causing proven, life-long harms.  *See NFIB*, 567 U.S. at 581 (plurality opinion).

### C.  The 2024 Rule is arbitrary and capricious.

The 2024 Rule is also "arbitrary" and "capricious" on several grounds.  5 U.S.C. § 706(2)(A); *see* Compl. ¶¶ 279-85.  Chief among them:  HHS failed to adequately consider—or offer a reasoned explanation addressing—the reality that their rule would prevent healthcare professionals from using their reasonable medical judgment to treat patients, undermining the provision of sound medical treatment on a wide scale.  Without explanation, HHS pivoted from its prior position that preferencing ideology over science "risk[s] masking clinically relevant, and sometimes vitally important, information." 85 Fed. Reg. 37,160, 37,189-90 (June 19, 2020).  It now mandates that medical professionals embrace the WPATH Standards and Endocrine Society Guideline.  *See* NPRM, 87 Fed. Reg. at 47,868 & n.423.  And it does so without "respond[ing] to significant comments" pointing out that these standards rest on weak evidence, *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015); *see* Compl. ¶ 173 (collecting comments), without acknowledging the lack of medical consensus on gender-transition interventions or side-effects associated therewith, Compl. ¶¶ 87-104, and without addressing the potential tort liability that healthcare providers face for following unproven standards, 42 U.S.C. § 18122(3) (stating that malpractice claims not preempted).  This is exactly the type of arbitrary decision-making that the APA protects against.  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## II.  Plaintiffs Will Be Irreparably Harmed Absent Injunctive Relief.

Without immediate intervention, HHS's 2024 Rule will inflict significant irreparable harm on the Plaintiff States, their medical providers, and their citizens.[3]  *First*, the States will suffer the

---

[3] The Complaint includes paragraphs specific to each of the Plaintiff States.  *See generally* ECF 1 ¶¶ 106-36, 199-232.  To offer additional details about the irreparable harm the Plaintiff States are likely to suffer, nine States have submitted declarations.  *See* Exhibits A-J.

"irreparable harm of nonrecoverable compliance costs." *R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 194 (5th Cir. 2023) (citation omitted). States will need to expend significant financial and personnel resources to comply with HHS's mandates. *See* Stephen Smith Decl. ¶¶ 13-14 (Ex. A); Cody Smith Decl. ¶¶ 11-12 (Ex. B); Kimberly Sullivan Decl. ¶¶ 12-13 (Ex. C); Jeremy Brunssen Decl. ¶¶13-14 (Ex. D). The 2024 Rule acknowledges as much. *See* 89 Fed. Reg. at 37,679-82 (estimating hundreds of millions of dollars in costs to revise policies and procedures, train employees, and implement record-keeping requirements); *see also* Compl. ¶¶ 200-01. And HHS's sovereign immunity guarantees that Plaintiffs could not later recover those costs, even if the Rule is held unlawful.

*Second*, the 2024 Rule derogates the States' sovereign interests in enforcing their duly enacted laws and regulations. *See Texas v. Becerra*, 577 F. Supp. 3d 527, 557 (N.D. Tex. 2021); *see also Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 277 (2022) (describing the power to enforce state laws as "[p]aramount among the States' retained sovereign powers"). For instance, many of the Plaintiff States have adopted laws prohibiting healthcare providers from offering gender-transition interventions to minors. Compl. ¶¶ 107-09, 117-18, 126, 128, 130-36. Many of the Plaintiff States have also declined to cover certain gender-transition interventions through their Medicaid, CHIP, or state-employee health programs. *Id.* ¶¶ 112-13, 116, 121-26, 129, 132-35. Compliance with the 2024 Rule would "prevent[] the State[s] from effectuating the[ir] Legislature[s'] choice[s] and hence impose[] irreparable injury." *Valentine v. Collier*, 956 F.3d 797, 803 (5th Cir. 2020)

*Third*, enforcement of the 2024 Rule threatens to collectively strip Plaintiff States of more than $100 *billion* in federal funds and to impose substantial penalties through private suits. *Id.* ¶¶ 206-11. The 2024 Rule makes clear that its gender-identity mandates and other provisions displace contrary state policies. 89 Fed. Reg. at 37,667-68. Because the Plaintiffs have conflicting policies, they face funding losses that endanger important health programs serving some of their most vulnerable residents. As one example, Tennessee annually receives more than $10 billion in HHS funding to

administer its Medicaid and CHIP programs, which collectively serve nearly 1.5 million Tennesseans, including low-income individuals, pregnant women, children, caretaker relatives of young children, older adults, and the disabled.  S. Smith Decl. ¶¶ 4-7.  But Tennessee's Medicaid and CHIP programs do not cover gender-transition surgeries.  *Id.* ¶¶ 9-10.  Tennessee thus faces a credible threat that HHS will enforce the 2024 Rule against it and terminate its federal funding for those programs, not to mention the State's exposure to civil liability under Section 1557's private right of action.  The same goes for Mississippi and the other Plaintiff States.  *See, e.g.*, C. Smith Decl. ¶¶4-8; Brunssen Decl. ¶¶ 4-7, 16; Roberts Decl. ¶¶ 5-6, 8-9; Steven Voigt Decl. ¶¶ 5-7 (Ex. F); Robert Kerr Decl. ¶¶ 5-8, 10-11 (Ex. G); Wanda Davis Decl. ¶¶ 5-7 (Ex. H); Matthew Althoff Decl. ¶¶ 9-10 (Ex. I); Stephanie Azar Decl. ¶¶ 4-8 (Ex. J).

*Fourth*, the 2024 Rule's mandate that health insurers cover gender-transition drugs and surgeries will inevitably result in increased costs for Plaintiff States' health plans.  In addition to puberty blockers and cross-sex hormones, WPATH lists a non-exhaustive suite of "medically necessary" so-called "gender-affirming surgical procedures"—like facelifts, lip augmentation, and hair removal.  *See* Compl. ¶¶ 213-14 (citing WPATH 8 at S110, S258 App'x E).  The cost of covering these treatments would be significant.  *See id.* ¶¶ 215-27; *see, e.g.*, S. Smith Decl. ¶ 15; C. Smith Decl. ¶ 13; Sullivan Decl. ¶ 14; Brunssen Decl. ¶ 16; Roberts Decl. ¶ 11-12; Kerr Decl. ¶ 11; Davis Decl. ¶¶ 11; Althoff Decl. ¶ 14; Azar Decl. ¶ 10.  Thus, the 2024 Rule's gender-transition mandate will have a "substantial" fiscal effect that Plaintiffs cannot later recover.  89 Fed. Reg. at 37,683.

*Finally*, the 2024 Rule will subject some of the Plaintiff States' most vulnerable citizens to a gender-transition protocol that will leave them with irreversible side effects—including steriliza-tion—and life-long health risks.  Compl. ¶¶ 228-32.  The latest systematic review of the available research confirms the lack of quality evidence regarding the efficacy of medical gender transition, particularly for minors.  *See id.* ¶ 229.  The harm from gender-transition interventions, however, is

evident.  *See* Compl. ¶¶ 87-104.  That adolescents often "lack the capacity to consent to such a significant and potentially irreversible treatment" amplifies these concerns.  *L.W.*, 83 F.4th at 488.  With increasing frequency, detransitioners have come forward lamenting the harmful effects of these interventions and their regret for undergoing them. *Id.* at 487.

## III.   The Balance of Equities and Public Interest Both Favor Preliminary Relief.

Preliminary relief will not harm HHS or the public interest.  A stay will merely "maintain[] the status quo while the court considers the issue." *Texas v. United States*, 787 F.3d 733, 768 (5th Cir. 2015).  HHS will be able to continue enforcing Section 1557 to prevent actual "sex" discrimination, as well as prohibited discrimination based on race, disability, national origin, and age.  It simply will not be able to enforce the misreading of Section 1557 embodied by the 2024 Rule.

"Any interest [the government] may claim in enforcing an unlawful [rule] is illegitimate." *BST Holdings v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021).  Indeed, "our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 766 (2021).  Instead, the public interest lies in a correct application of the law.  *See Freedom from Religion Found., Inc. v. Mack*, 4 F.4th 306, 317 (5th Cir. 2021).  And "[e]nforcing the Spending Clause's limitations" further advances the public interest by "help[ing] preserve state sovereignty and the 'two-government system establish by the Framers.'" *West Virginia*, 59 F.4th at 1149 (citation omitted).

More still, the public has overwhelming interests in protecting youth and other vulnerable citizens from unproven and often harmful gender-transition interventions, preventing limited state resources from being used to fund them, and continuing to enforce State laws that reflect the will of the people without risking the loss of significant federal funding and exposure to civil liability. Preliminary relief would advance each of those interests.

## CONCLUSION

This Court should grant Plaintiff States' motion for a § 705 stay and a preliminary injunction.

Date: June 13, 2024.                    Respectfully submitted,

**LYNN FITCH**
  *Attorney General*

/s/ *Scott G. Stewart*
SCOTT G. STEWART
  *Solicitor General*
  Bar No. 106359
JUSTIN L. MATHENY
  *Deputy Solicitor General*
  Bar No. 100754
MISSISSIPPI ATTORNEY GENERAL'S OFFICE
P.O. Box 220
Jackson, Mississippi 39205
(601) 359-3680
scott.stewart@ago.ms.gov
justin.matheny@ago.ms.gov
*Counsel for Plaintiff State of Mississippi*

**JONATHAN SKRMETTI**
  *Attorney General & Reporter*

/s/ *Steven J. Griffin*
STEVEN J. GRIFFIN
  *Senior Counsel for Strategic Litigation*
  Bar No. 103218
WHITNEY HERMANDORFER*
  *Director of Strategic Litigation*
HARRISON GRAY KILGORE*
  *Strategic Litigation Counsel and Assistant Solicitor General*
OFFICE OF THE TENNESSEE ATTORNEY GENERAL
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-3491
steven.griffin@ag.tn.gov
whitney.hermandorfer@ag.tn.gov
harrison.kilgore@ag.tn.gov
*Counsel for Plaintiff State of Tennessee*

**STEVE MARSHALL**
  *Attorney General*

/s/ *A. Barrett Bowdre*
A. BARRETT BOWDRE*
  *Principal Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
(334) 242-7300
barrett.bowdre@AlabamaAG.gov
*Counsel for Plaintiff State of Alabama*

**CHRISTOPHER CARR**
  *Attorney General*

/s/ *Stephen Petrany*
STEPHEN PETRANY*
  *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL OF GEORGIA
Georgia Department of Law
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov
*Counsel for Plaintiff State of Georgia*

26

**THEODORE E. ROKITA**
*Attorney General*

/s/ *James A. Barta*
JAMES A. BARTA*
*Solicitor General*
INDIANA ATTORNEY GENERAL'S OFFICE
IGCS – 5th Floor
302 W. Washington St.
Indianapolis, Indiana 46204
(317) 232-0709
James.Barta@atg.in.gov
*Counsel for Plaintiff State of Indiana*


**RUSSELL COLEMAN**
*Attorney General*

/s/ *Justin D. Clark*
JUSTIN D. CLARK*
*Civil Chief*
LINDSEY R. KEISER**
*Assistant Attorney General*
COMMONWEALTH OF KENTUCKY
OFFICE OF THE ATTORNEY GENERAL
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
justind.clark@ky.gov
lindsey.keiser@ky.gov
*Counsel for Plaintiff Commonwealth of Kentucky*


**MICHAEL T. HILGERS**
*Attorney General*

/s/ *Lincoln J. Korell*
LINCOLN J. KORELL*
*Assistant Solicitor General*
OFFICE OF THE ATTORNEY GENERAL OF
NEBRASKA
2115 State Capitol
Lincoln, Nebraska 68509
(402) 471-2682
lincoln.korell@nebraska.gov
*Counsel for Plaintiff State of Nebraska*


**KRIS W. KOBACH**
*Attorney General*

/s/ *Jay Rodriguez*
JAY RODRIGUEZ*
*Assistant Attorney General*
OFFICE OF THE KANSAS ATTORNEY GENERAL
120 SW 10th Ave.
Topeka, Kansas 66612
(785) 296-4733
jay.rodriguez@ag.ks.gov
*Counsel for Plaintiff State of Kansas*


**ELIZABETH B. MURRILL**
*Attorney General*

/s/ *Kelsey L. Smith*
KELSEY L. SMITH**
*Deputy Solicitor General*
OFFICE OF THE LOUISIANA ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, Louisiana 70802
aguinagab@ag.louisiana.gov
*Counsel for Plaintiff State of Kansas*


**DAVE YOST**
*Attorney General*

/s/ *T. Elliot Gaiser*
T. ELLIOT GAISER*
*Solicitor General*
OFFICE OF THE OHIO ATTORNEY GENERAL
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
(614) 466-8980
Thomas.Gaiser@ohioago.gov
*Counsel for the State of Ohio*

**GENTNER DRUMMOND**
  *Attorney General*

/s/ *Garry M. Gaskins, II*
GARRY M. GASKINS, II**
  *Solicitor General*
OKLAHOMA OFFICE OF THE ATTORNEY GENERAL
313 NE 21st Street
Oklahoma City, Oklahoma 73105
(405) 312-2451
Garry.Gaskins@oag.ok.gov
*Counsel for the State of Ohio*


**MARTY J. JACKLEY**
  *Attorney General*

/s/ *Clifton Katz*
CLIFTON KATZ*
  *Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF SOUTH DAKOTA
1302 E. Hwy. 14, Suite #1
Pierre, South Dakota  57501
(605) 773-3215
clifton.katz@state.sd.us
*Counsel for Plaintiff State of South Dakota*


**PATRICK MORRISEY**
  *Attorney General*

/s/ *Michael R. Williams*
MICHAEL R. WILLIAMS*
  *Principal Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL OF
WEST VIRGINIA
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
michael.r.williams@wvago.gov
*Counsel for Plaintiff State of Virginia*


**ALAN WILSON**
  *Attorney General*

/s/ *Thomas T. Hydrick*
THOMAS T. HYDRICK*
  *Assistant Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
OF SOUTH CAROLINA
1000 Assembly Street
Columbia, South Carolina 29201
(803) 734-4127
thomashydrick@scag.gov
*Counsel for Plaintiff State of South Carolina*


**JASON S. MIYARES**
  *Attorney General*

/s/ *Kevin M. Gallagher*
KEVIN M. GALLAGHER*
  *Principal Deputy Solicitor General*
BRENDAN T. CHESTNUT*
  *Deputy Solicitor General*
VIRGINIA ATTORNEY GENERAL'S OFFICE
202 North 9th Street
Richmond, Virginia 23219
(804) 786-2071
kgallagher@oag.state.va.us
bchestnut@oag.state.va.us
*Counsel for Plaintiff Commonwealth of Virginia*


*Admitted *Pro Hac Vice*
**Pro Hac Vice Application Forthcoming

**CERTIFICATE OF SERVICE**

I hereby certify that on June 13, 2024, a true and correct copy of the foregoing document was served via the Court's electronic filing system, which sent notice of filing to all counsel of record.

/s/ *Steven J. Griffin*
STEVEN J. GRIFFIN
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
steven.griffin@ag.tn.gov

*Counsel for Plaintiff State of Tennessee*