IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

**STATE OF TENNESSEE, et al.**                                    **PLAINTIFFS**

**v.**                                    **CAUSE NO. 1:24cv161-LG-BWR**

**XAVIER BECERRA, in his official capacity as Secretary of the United States Department of Health and Human Services, et al.**                                    **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR EXPEDITED RELIEF, § 705 RELIEF, AND A PRELIMINARY INJUNCTION

**BEFORE THE COURT** is the [20] Urgent and Necessitous Motion for § 705 Relief, a Preliminary Injunction, and Expedited Relief filed by Plaintiffs State of Tennessee, State of Mississippi, State of Alabama, State of Georgia, State of Indiana, State of Kansas, Commonwealth of Kentucky, State of Louisiana, State of Nebraska, State of Ohio, State of Oklahoma, State of South Carolina, State of South Dakota, Commonwealth of Virginia, and State of West Virginia. Plaintiffs seek to enjoin the following defendants from enforcing a final rule issued by the United States Department of Health and Human Services ("HHS") on May 6, 2024: The HHS, Xavier Becerra in his official capacity as Secretary of HHS, Melanie Fontes Rainer in her official capacity as the Director of the Office for Civil Rights, the Centers for Medicare and Medicaid Services, and Chiquita Brooks-LaSure in her official capacity as Administrator of the Centers for Medicare and Medicaid

Services.  *See* Nondiscrimination in Health Programs and Activities, 89 Fed. Reg. 37,522 (May 6, 2024) (hereafter referred to as the "May 2024 Rule").  Plaintiffs also seek a stay of the July 5, 2024, effective date of the May 2024 Rule.  The parties have fully briefed the Motion.

After reviewing the submissions of the parties, the record in this matter, and the applicable law, the Court finds that Plaintiffs have demonstrated they are entitled to a stay of the effective date of the May 2024 Rule, and a preliminary injunction prohibiting Defendants from enforcing, relying on, implementing, or otherwise acting pursuant to the May 2024 Rule's challenged provisions.

## I.  **INTRODUCTION**

In the absence of Congressional action addressing discrimination on the basis of gender identity, the Executive Branch began publishing regulations and policy statements in 2016 that interpreted Title IX's prohibition of discrimination on the basis of sex to include discrimination on the basis of gender identity.  As discussed in detail below, this lawsuit and the pending Motion challenges HHS's latest regulation, which purportedly implements the prohibition of discrimination set forth in Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116(a).  The ACA incorporates the provisions of Title IX in order to address sex discrimination in the healthcare field.  *Id.*

## II.  **PLAINTIFFS' COMPLAINT**

Plaintiffs include fifteen individual states that allege HHS is "seek[ing] to supplant [their] health regulations with a regime that sides with HHS's

commitment to gender ideology over medical reality." (Compl. at 1-2, ECF No. 1).
The Complaint alleges that HHS's May 2024 Rule would require Plaintiffs to "use
taxpayer funds to pay for unproven and costly gender-transition interventions
through Medicaid and state health plans — even for children who may suffer
irreversible harms." (*Id.* at 2). Plaintiffs further allege that the May 2024 Rule
attempts to outlaw policy decisions "excluding insurance coverage for risky and
costly gender-transition surgeries . . . ." (*Id.* at 6). Plaintiffs contend that the Rule
"unlawfully coerces [their] compliance by threatening to strip billions of dollars in
federal funding that assists their most vulnerable populations." (*Id.*). Since
Plaintiffs "could not have foreseen" that Section 1557 would be implemented in this
manner, they "accepted these federal dollars from HHS and built extensive health
programs — with annual budgets in the billions — in reliance on that funding."
(*Id.*). Plaintiffs also fear that the May 2024 Rule will subject them to lawsuits by
employees and patients, "even though neither Congress nor the States intended to
waive the States' sovereign immunity in these areas." (*Id.*).

Plaintiffs maintain that the May 2024 Rule violates: (1) 5 U.S.C. § 706(2)(A),
(C) by unlawfully defining "on the basis of sex"; (2) 5 U.S.C. § 706(2)(A), (C) by
unlawfully regulating the practice of medicine; (3) 5 U.S.C. § 706(2)(B) because it is
contrary to the Spending Clause, Nondelegation Doctrine, and the Eleventh
Amendment of the United States Constitution; and (4) 5 U.S.C. § 706(2)(A) because
it is arbitrary and capricious. (*Id.* at 64-75).

In the present Motion for § 705 Relief and a Preliminary Injunction, Plaintiffs seek an order:

>   a. Declaring the 2024 Rule's redefinition of sex discrimination likely unlawful under Section 1557 of the Affordable Care Act, the Administrative Procedure Act, and the U.S. Constitution;

>   b. Staying the effective date of the 2024 Rule, pursuant to 5 U.S.C. § 705, as it pertains to the provisions set forth at 42 C.F.R. §§ 438.3, 438.206, 440.262, 460.98, 460.112; 45 C.F.R. §§ 92.5, 92.6, 92.7, 92.8, 92.9, 92.10, 92.101, 92.206-211, 92.301, 92.303, 92.304; and any other provision of the 2024 Rule applied with respect to "sex" discrimination that encompasses gender identity;

>   c. Preliminarily enjoining HHS, and any other agency or employee of the United States, from enforcing, relying on, implementing, or otherwise acting pursuant to the 2024 Rule's challenged provisions; and

>   d. Granting any and all other preliminary relief the Court deems proper.

(Mot. at 2, ECF No. 20).

HHS counters that its May 2024 Rule merely clarifies that "sex discrimination necessarily includes discrimination" in accord with the rationale of *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644 (2020).  (HHS's Resp. at 1, ECF No. 24). It claims that "most of Plaintiffs' arguments . . . suffer from the same fatal flaw: they ask this Court to enjoin a Rule that has not yet been applied by the agency." (*Id.*).  It further notes that "a covered entity does not violate § 1557 if it has a legitimate nondiscriminatory reason for denying care or coverage to a transgender person." (*Id.*).

## III.  <u>STATUTORY AND REGULATORY BACKGROUND</u>

In 1972, Congress enacted Title IX, which provides, "No person in the United States shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a) (emphasis added).[1]  The statute excepts certain educational institutions, social fraternities and sororities, "voluntary youth service organizations," "Boy or Girl conferences," "father-son or mother-daughter activities at educational institutions," and institute of higher learning scholarship awards in "beauty" pageants from this prohibition of discrimination on the basis of sex.  *Id.*

Section 1557 of the ACA, which was enacted in 2010, prohibits discrimination "on the ground prohibited by title IX . . . under any health program or activity, any part of which is receiving Federal financial assistance . . . or under any program or activity that is administered by an Executive Agency . . . ."  42 U.S.C. § 18116(a).  The ACA also adopts the "enforcement mechanisms provided for and available under" Title IX "for purposes of violations of this subsection."  *Id.*  The Secretary of HHS is responsible for enforcing Section 1557 and promulgating regulations to implement it.  42 U.S.C. § 18116(c).

---

[1] A detailed history and analysis of the enactment of Title IX can be found in *Tennessee v. Cardona*, No. CV 2: 24-072-DCR, 2024 WL 3019146, at **1-5 (E.D. Ky. June 17, 2024) (enjoining HHS from enforcing a recent regulation interpreting Title IX to prohibit discrimination on the basis of gender identity and sexual orientation in education).

In 2016, HHS issued its first rule providing that the prohibition of sex discrimination set forth in Section 1557 includes discrimination on the basis of gender identity and termination of pregnancy.  *See* Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,375 (May 18, 2016).  Soon afterwards, the United States District Court for the Northern District of Texas issued a nationwide preliminary injunction prohibiting enforcement of the 2016 rule.  *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 696 (N.D. Tex. 2016).[2]  HHS repealed the 2016 Rule in 2020.  *See* Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. 37,160 (June 19, 2020).  The United States District Court for the Eastern District of New York stayed the repeal and preliminarily enjoined HHS from enforcing the 2020 repeal.  *Walker v. Azar*, 480 F. Supp. 3d 417, 430 (E.D.N.Y. 2020).

On June 15, 2020, the Supreme Court held that an employer who fires a person for being homosexual or transgender violates Title VII because, in that circumstance, the termination is "for traits or actions [the employer] would not have questioned in members of a different sex."  *Bostock*, 590 U.S. at 651.  Although the *Bostock* Court assumed that the word "sex," in Title VII referred to the biological

---

[2] The case styled *Franciscan Alliance, Inc. v. Becerra*, 7:16cv108-O (N.D. Tex.), had a lengthy and complicated procedural history due to the agency and executive actions that took place during that time.  *See Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 372-74 (5th Cir. 2022).  The Fifth Circuit ultimately found that the plaintiff's APA claim was moot and that the district court's vacatur of the 2016 Rule should remain in effect.  *Franciscan All., Inc. v. Becerra*, 47 F.4th 372-74, 377 (5th Cir. 2022).  It reasoned that "[p]ermitting important agency rules to flicker in and out of existence is detrimental to the rule of law."  *Id.* at 375.

distinctions between male and female when Title VII was enacted in 1964, it held,
"For an employer to discriminate against employees for being homosexual or
transgender, the employer must intentionally discriminate against individual men
and women in part because of sex." *Id.* at 655, 662.

In January 2021, President Biden issued an Executive Order entitled
Preventing and Combating Discrimination on the Basis of Gender Identity or
Sexual Orientation, Biden Executive Order No. 13,988, 86 Fed. Reg. 07023-25 (Jan.
25, 2021). Two months later, the Department of Justice issued guidance instructing
federal agencies to apply *Bostock* to Title IX. Pamela S. Karlan, Principal Deputy
Assistant Att'y Gen., U.S. Dep't of Justice, C.R. Div., Memorandum re: Application
of *Bostock v. Clayton County* to Title IX of the Education Amendments of 1972 (Mar.
26, 2021). And in May of that year, HHS published guidance "inform[ing] the public
that, consistent with the Supreme Court's decision in *Bostock* and Title IX,
beginning May 10, 2021, [HHS] will interpret and enforce section 1557 of the
Affordable Care Act prohibition on discrimination on the basis of sex to include:
Discrimination on the basis of sexual orientation; and discrimination on the basis of
gender identity." Notification of Interpretation and Enforcement of Section 1557 of
the Affordable Care Act and Title IX of the Education Amendments of 1972, 86 Fed.
Reg. 27,984 (May 25, 2021) (hereafter referred to as "May 2021 Notification"). HHS
explained that "[t]his interpretation will guide the Office of Civil Rights (OCR) in
processing complaints and conducting investigations, but [it] does not itself
determine the outcome in any particular case or set of facts." *Id.*

The May 2021 Notification was challenged by Texas doctors who claimed that HHS had "misread *Bostock* and argued that healthcare providers may continue [to make] sex-specific medical decisions relevant to 'gender identity' so long as one does not engage in 'sex' discrimination when doing so." *Neese v. Becerra*, 640 F. Supp. 3d 668, 673 (N.D. Tex. 2022). On November 11, 2022, the *Neese* court held that the May 2021 HHS notification was unlawful and should be set aside. *Id.* at 685-87.[3]

In March 2022, HHS issued a "Notice and Guidance on Gender Affirming Care" (the "2022 Notice"). "The 2022 Notice state[d] that attempts to restrict gender-reassignment surgeries are dangerous and covered entities restricting an individual's ability to receive gender-affirming care likely violate Section 1557." *Franciscan All., Inc.*, 47 F.4th at 373-74 (citations omitted). The 2022 Notice also provided that HHS "is investigating and, where appropriate, enforcing Section 1557" in "cases involving discrimination on the basis of . . . gender identity." *Id.* On October 1, 2022, the United States District Court for the Northern District of Texas held that the 2022 Notice was arbitrary and capricious, and it issued a declaratory judgment that the 2022 Notice was unlawful. *State of Texas v. EEOC*, 633 F. Supp. 3d 824 (N.D. Tex. 2022).[4] HHS did not appeal the Texas federal court's decision.

Prior to entry of the decisions in *Neese* and *State of Texas v. EEOC*, HHS "propose[d] to address nondiscrimination on the basis of sex, including gender

---

[3] The *Neese* decision is currently on appeal. *See Neese v. Becerra,* 640 F. Supp. 668 (N.D. Tex. 2022), *appeal docketed,* No. 23-10078 (5th Cir. Jan. 25, 2023).

[4] The *State of Texas v. EEOC* case also concerned an EEOC Notice and Guidance that is not relevant to the present Motion. *See* 633 F. Supp. 3d at 828.

-8-

identity and sexual orientation, consistent with *Bostock* and related case law, as well as subsequent Federal agency interpretations." Nondiscrimination in Health Programs and Activities, 87 Fed. Reg. 47,824-01 (Aug. 4, 2022). After notice and comment, HHS amended and published the rule, which is now the subject of this lawsuit.

## IV. <u>DISCUSSION</u>

### A.   <u>Standing</u>

In order to preserve the separation of powers, Article III of the United States Constitution limits judicial power to cases and controversies. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341-42 (2006); *see also* U.S. CONST. art. III, § 2, cl. 1. "For there to be a case or controversy under Article III, the plaintiff must have a "personal stake in the case — in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (internal quotation marks omitted). In order to establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* at 423. In other words, "[i]f the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve." *Id.*

As explained in more detail below, the Court finds that Plaintiffs have demonstrated that the May 2024 Rule will cause concrete, imminent injury in the form of compliance costs. *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602

U.S. 367, 382 (2024) ("Government regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements."). This injury will likely be redressed by the injunctive relief sought by Plaintiffs since enjoining enforcement of the May 2024 Rule would prevent the Plaintiffs from incurring compliance costs.[5]

B.    Requirements for Imposing a Preliminary Injunction and a § 705 Stay

In order to obtain a preliminary injunction, plaintiffs must demonstrate the following four elements:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011). The first two elements "are the most critical." *Career Colleges & Schs. of Tex. v. United States Dep't of Educ.*, 98 F. 4th 220, 233 (5th Cir. 2024). "And there is authority that likelihood of success on the merits is the most important [element] . . . ." *Id.* (citations omitted). "A preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements." *Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*, 577 F.3d 250, 253 (5th Cir. 2009) (citations omitted).

---

[5] HHS argues that all of the Plaintiffs except the State of Tennessee lack Article III standing to challenge the May 2024 Rule's amendments to 45 C.F.R. § 92.206. However, if at least one plaintiff has standing, the lawsuit may proceed. *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52, n.2 (2006).

In addition, the APA provides that a district court "may issue all necessary and appropriate process to postpone the effective date of any agency action" to the extent necessary to prevent irreparable injury.  5 U.S.C. § 705.  The parties agree that the same four requirements for imposing a preliminary injunction also apply to a § 705 stay.

### 1.   Substantial Likelihood of Success on the Merits

When considering plaintiffs' likelihood of success on the merits, courts look to "standards provided by the substantive law."  *Jordan v. Fisher*, 823 F.3d 805, 809 (5th Cir. 2016), *as revised* (June 27, 2016).  Plaintiffs base their claims on Section 706 of the APA, which requires courts reviewing agency action to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."  5 U.S.C. § 706.

> The reviewing court shall . . . hold unlawful and set aside agency
> action . . . found to be --
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in
> accordance with law;
> (B) contrary to constitutional right, power, privilege, or immunity; [or]
> (C) in excess of statutory jurisdiction, authority, or limitations, or short
> of statutory right . . . .

5 U.S.C. § 706 (2)(A-C).

Plaintiffs raise four general challenges to the May 2024 Rule.  Here, it is only necessary to determine whether Plaintiffs have established a substantially likelihood that HHS exceeded its statutory authority when it applied the *Bostock* holding to interpret the phrase "on the basis of sex" in Title IX.  Given that agencies

are "mere creatures of statute," this inquiry requires interpretation of the statute's

plain meaning, which involves consideration of the statute's language as well "as

the language and design of the statute as a whole." *Inhance Techs., L.L.C. v. U.S.*

*Env't Prot. Agency*, 96 F.4th 888, 893 (5th Cir. 2024).

The Supreme Court recently held that agencies are no longer entitled to

deference pursuant to *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.* , 467 U.S.

837, 839 (1984), because Chevron "allow[ed] agencies to change course even when

Congress [had] given them no authority to do so." *Loper Bright Enters. v.*

*Raimondo*, No. 22-1219, 2024 WL 3208360, at \*21 (U.S. June 28, 2024).  Thus,

*Chevron* "foster[ed] unwarranted instability in the law, leaving those attempting to

plan around agency action in an eternal fog of uncertainty."  *Id.* at \*21 (internal

citations and quotation marks omitted).  Now, courts

> must exercise their independent judgment in deciding whether an
> agency has acted within its statutory authority, as the APA requires.
> Careful attention to the judgment of the Executive Branch may help
> inform that inquiry.  And when a particular statute delegates
> authority to an agency consistent with constitutional limits, courts
> must respect the delegation, while ensuring that the agency acts
> within it.  But courts need not and under the APA may not defer to an
> agency interpretation of the law simply because a statute is
> ambiguous.

*Id.* at \*22.

The Supreme Court further held that "statutes, no matter how impenetrable,

do — in fact, must — have a single, best meaning.  That is the whole point of having

written statutes; 'every statute's meaning is fixed at the time of enactment.'"  *Id.* at

\*16 (quoting *Wisc. Cent. Ltd v. United States*, 585 U.S. 274, 284 (2018)).  For this

reason, courts must interpret words included in a statute "consistent with their ordinary meaning . . . at the time Congress enacted the statute." *Wisc. Cent. Ltd*, 585 U.S. at 284.  Meanwhile, a statute's scope is determined by examining its "text in light of context, structure, and related statutory provisions." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 558 (2005).  If an agency's interpretation of its statutory authority "is not the one the court, after applying all relevant interpretive tools, concludes is best . . . it is not permissible." *Id.* at *16.

42 U.S.C. § 18116 (c) grants the Secretary of HHS authority to promulgate regulations implementing Section 1557 of the ACA.  The relevant, substantive portion of the statute provides:

> An individual shall not, *on the ground prohibited under . . . title IX of the Education Amendments of 1972, (20 U.S.C. 1681 et seq.),* . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments).

42 U.S.C. § 18116 (a) (emphasis added).  Plaintiffs argue that the May 2024 Rule exceeds HHS's statutory authority because "[n]either Section 1557 nor Title IX mention 'gender identity' as a protected category."  (Pl.'s Mem. at 11, ECF No. 21).  "Instead," they point out, "Congress expressly limited the statutes' coverage to discrimination on the basis of *sex*."  (*Id.*) (emphasis in original).

HHS counters that the meaning of the term "sex" is irrelevant because the *Bostock* Court held, "[N]othing in our approach to these cases turns on the outcome of the parties' debate" over the definition of "sex."  (HHS's Resp. at 9, ECF No. 24)

-13-

(quoting *Bostock*, 590 U.S. at 655).[6]  Furthermore the preamble to the May 2024
Rule states that HHS "determined it is not necessary to define 'sex' in this rule[.]"
89 Fed. Reg. at 37,575.  The Court finds that HHS's position is not persuasive.  As
explained in more detail infra, *Bostock*'s holding hinged on the broad "but for"
causation standard applicable to Title VII, while the present case pertains to a very
different statutory scheme, Title IX.[7]  Furthermore, the *Bostock* Court expressly
limited its holding to Title VII claims when it stated, "[N]one of these other [sex
discrimination] laws are before us; we have not had the benefit of adversarial
testing about the meaning of their terms, and we do not prejudge any such question
today. . . ." *Bostock*, 590 U.S. at 681.

Since the word "sex" is not defined in Title IX, courts must interpret the term
according to its meaning in or around 1972, when the statute was enacted.  *See
Wisc. Cent. Ltd*, 585 U.S. at 284.  The day before Title IX was enacted, the Supreme
Court stated, "The truth is that the two sexes are not fungible; a community made
up exclusively of one is different from a community composed of both." *Peters v.
Kiff*, 407 U.S. 493, 504 n.12 (1972).  Soon after Title IX's enactment, the Court

---

[6] The *Bostock* Court explained, "[B]ecause the employees concede the point for
argument's sake, we proceed on the assumption that 'sex' signified what the
employers suggest, referring only to biological distinctions between male and
female." *Bostock*, 590 U.S. at 655.
[7] The lack of a definition of the term "sex" in the May 2024 Rule results in
ambiguity that undermines many of HHS's arguments in the case.  For example, it
argues, "[N]othing in the Rule 'prohibits a covered entity from operating sex
separated programs and facilities.'" (HHS Resp. at 15, ECF No. 24) (quoting 89 Fed.
Reg. 37,593).  The impact of this statement necessarily depends on what HHS
means by "sex," i.e., whether it includes "gender identity" in the meaning of that
term.

expressed its view that "sex, like race and national origin, is an immutable
characteristic determined solely by the accident of birth." *Frontiero v. Richardson*,
411 U.S. 677, 686 (1973).

After reviewing definitions of "sex" published in dictionaries contemporary
with the enactment of Title IX, the Eleventh Circuit determined that "when
Congress prohibited discrimination on the basis of 'sex' in education [in Title IX], it
meant biological sex, i.e., discrimination between males and females." *Adams ex rel.
Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812 (11th Cir. 2022) (en banc);
*see also Neese*, 640 F. Supp. at 678 n.6 (determining that, when Title IX was
enacted, "'sex' was commonly understood to refer to physiological differences
between men and women — particularly with respect to reproductive functions.").

In *Adams*, the Eleventh Circuit dismissed assertions that the term "sex" in
Title IX is ambiguous because, "[i]f 'sex' were ambiguous, it is difficult to fathom
why the drafters of Title IX went through the trouble of providing an express carve-
out for sex-separated living facilities, as part of the overall statutory scheme." *Id.* at
813.  For example, those who identify as transgender "would be able to live in both
living facilities associated with their biological sex and living facilities associated
with their gender identity." *Id.*  Therefore, the Eleventh Circuit explained:

> [R]eading "sex" to include "gender identity" . . . would result in
> situations where an entity would be prohibited from installing or
> enforcing the otherwise permissible sex-based carve-outs when the
> carve-outs come into conflict with a transgender person's gender
> identity.  Such a reading would thereby establish dual protection
> under Title IX based on both sex and gender identity when gender
> identity does not match sex.  That conclusion cannot comport with the
> plain meaning of "sex" at the time of Title IX's enactment and the

purpose of Title IX and its implementing regulations, as derived from their text.

*Id.* at 814.[8]

While considering Title VII in *Bostock*, the Supreme Court noted that the pertinent question "isn't just what 'sex' meant [when the statute was enacted], but what [the statute] says about it."  590 U.S. at 656.  It continued:

> Most notably, the statute prohibits employers from taking certain actions "because of " sex.  And, as this Court has previously explained, the ordinary meaning of 'because of' is 'by reason of' or 'on account of.'" In the language of law, this means that Title VII's "because of " test incorporates the simple and traditional standard of but-for causation.  That form of causation is established whenever a particular outcome would not have happened "but for" the purported cause.  In other words, a but-for test directs us to change one thing at a time and see if the outcome changes.  If it does, we have found a but-for cause.

*Id.*  Since events often have multiple but-for causes, the *Bostock* Court explained, "[s]o long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law."  *Id.*  This "sweeping standard" led the Court to hold that an employer who fires a person for being homosexual or transgender violates Title VII because, in that circumstance, the termination is "for traits or actions [the employer] would not have questioned in members of a different sex."  *Id.* at 651-52.

However, *Bostock*'s ruling concerning Title VII does not apply to Title IX because Congress used different causation language in Title IX ("on the basis of

---

[8] HHS attempts to distinguish *Adams* by citing the Eleventh Circuit's analysis of the equal protection claims asserted by the plaintiff in that case, not the plaintiff's Title IX claims.  *Adams*, 57 F.4th at 808-09.  The Eleventh Circuit's discussion of the meaning of "sex" at the time of Title IX's enactment is persuasive in the present case.  *Id.* at 812-15.

sex") and Title VII ("because of . . . sex").  *Neese*, 640 F. Supp. 3d at 676-78.  In fact, the *Bostock* Court appeared to be speaking of Title IX when it stated, "The employers [who oppose interpreting discrimination "because of sex" to include gender identity and sexual orientation] might be onto something if Title VII *only ensured equal treatment between groups of men and women* or if the statute applied only when sex is the sole or primary reason for an employer's challenged adverse employment action."  *Bostock*, 590 U.S. at 671 (emphasis added).

The Court is aware that some Circuit courts have applied *Bostock* in Title IX cases.  For example, the Fourth Circuit has cited *Bostock* for the proposition that "discrimination against a person for being transgender is discrimination 'on the basis of sex'" in violation of Title IX.  *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), *as amended* (Aug. 28, 2020).  Therefore, the Fourth Circuit applied Title VII's but for causation standard and held:

> [T]he [School] Board could not exclude Grimm from the boys [sic] bathrooms without referencing his "biological gender" under the policy, which it has defined as the sex marker on his birth certificate.  Even if the Board's primary motivation in implementing or applying the policy was to exclude Grimm because he is transgender, his sex remains a but-for cause for the Board's actions.

*Id.* at 616.  Meanwhile, the Seventh Circuit has determined that *Bostock* provides "useful guidance" in a Title IX case, calling Title VII and Title IX "closely related area[s]" of law, and noting that both Title VII and Title IX "involve sex stereotypes and less favorable treatment because of the disfavored person's sex."  *Metro. Sch. Dist. of Martinsville*, 75 F.4th at 769.  The Seventh Circuit expressed doubt that "sex" should be "narrowly" interpreted "as something assigned at birth or a function

of chromosomal make-up." *Metro. Sch. Dist. of Martinsville*, 75 F.4th at 770.

Finally, the Ninth Circuit "'construe[s] Title IX's protections consistently with those

of Title VII' when considering a Title IX discrimination claim." *Grabowski v. Ariz.

Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023) (quoting *Doe v. Snyder*, 28 F.4th

103, 114 (9th Cir. 2022)).

However, in the Court's view, "Title VII . . . is a vastly different statute from

Title IX." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005).  "Title IX

condition[s] federal funding on a recipient's promise not to discriminate, in what

amounts essentially to a contract between the Government and the recipient.  In

contrast, Title VII is framed as an outright prohibition [of discrimination]." *Gebser

v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277 (1998).

Since Title IX and Section 1557 of the ACA were enacted pursuant to

Congress's authority under the Spending Clause of the Constitution, *Cummings v.

Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 218 (2022), the Supreme Court

"insists that Congress speak with a clear voice" when imposing conditions on the

receipt of federal funds, "recognizing that there can, of course, be no knowing

acceptance of the terms of the putative contract if a State is unaware of the

conditions imposed by the legislation or is unable to ascertain what is expected of

it." *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999) (cleaned up).

This "clarity requirement is a binding constitutional command, imposing a

constitutional bar on ambiguous spending conditions and providing grounds for an

injunction against the enforcement of such conditions." *Texas v. Yellen*, No. 22-

10560, 2024 WL 3159081, at *9 (5th Cir. June 25, 2024) (holding that).  Title VII, on the other hand, was enacted pursuant to the Commerce Clause, which grants Congress "expansive" regulatory power.  *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 549-50 (2012) (quoting U.S. Const. art. I, § 8, cl. 3)).

Neither Title IX nor Section 1557 contain clear statements prohibiting discrimination on the basis of gender identity; they only refer to "sex."  Since even the *Bostock* majority agreed that "homosexuality and transgender status are distinct concepts from sex," *Bostock*, 590 U.S. at 669, Plaintiffs would have had no way of knowing that sex discrimination would be interpreted as including transgender discrimination when they accepted federal funding and developed their healthcare programs.

The *Bostock* Title VII analysis is also inapplicable because the Fifth Circuit "does not unquestionably apply [Title VII case law] to Title IX."  *Neese*, 640 F. Supp. 3d at 677 (citing *inter alia Beasley v. St. Tammany Par. Sch. Bd.*, No. 94-2333, 1997 WL 382056, at *3 (E.D. La. July 9, 1997) ("Unlike other circuits, [the Fifth Circuit] does not blindly apply Title VII standards to the Title IX context.")).  While HHS cites *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992), in support of its argument that federal courts "have routinely looked to interpretations of Title VII to inform Title IX," (HHS Mem. at 9, ECF No. 24), the Fifth Circuit has held that "*Franklin* did not establish any sweeping parallel between Title IX and Title VII."  *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 655 (5th Cir. 1997).  In *Rosa*, the Fifth Circuit explained:

> [W]e cannot take liberties with statutory language or with the reasoning of the Supreme Court. *Franklin*'s single citation to [*Meritor Sav. Bank v. Vinson*, 477 U.S. 57 (1986),] to support the Court's conclusion that sexual harassment is sex discrimination does not by itself justify the importation of other aspects of Title VII law into the Title IX context.

*Id.* at 656.

HHS also relies on *Carder v. Cont'l Airlines, Inc.*, a Uniformed Services Employment and Reemployment Rights Act case where the Fifth Circuit mentioned, "Based on its legislative history, this court has interpreted Title IX as being intended to prohibit a wide spectrum of discrimination against women in the same manner as Title VII." 636 F.3d 172, 180 (5th Cir. 2011). However, that reference to Title VII and Title IX is limited to the employment discrimination context. *Id.* (citing *Lakoski v. James*, 66 F.3d 751, 757 (5th Cir. 1995) ("Title IX's proscription of sex discrimination, *when applied in the employment context*, does not differ from Title VII's.") (emphasis added); *see also Rosa H.*, 106 F.3d at 656. As a result, this Court, like the *Neese* court, fears that it "would risk amending [Title IX and Section 1557] outside the legislative process reserved for the people's representatives" if it failed to acknowledge the different language in Title VII and Title IX. *See Neese*, 640 F. Supp. 3d at 679.

Analysis of the language and provisions of Title IX, as well as its regulations, provides even more support for finding that the *Bostock* holding does not apply to Title IX and Section 1557. For example, "Title IX presumes sexual dimorphism in section after section, requiring equal treatment for each 'sex.'" *Neese*, 640 F. Supp. 3d at 680 (citing 20 U.S.C. § 1681(a)(2) (allowing schools in some cases to change

-20-

"from being an institution which admits only students of one sex to being an institution which admits students of *both sexes*"); 20 U.S.C. § 1681(a)(8) (stating if father-son or mother-daughter activities are provided for "one sex," reasonably comparable activities must be provided for "the *other* sex")).

HHS argues that these provisions of Title IX are irrelevant here because Section 1557 only incorporates the ground of discrimination prohibited by Title IX and its enforcement provisions.  (HHS's Resp. at 10, ECF No. 24).  However, "[t]he court's job is to interpret the words [in statutes] consistent with their ordinary meaning at the time Congress enacted the statutes unless the context in which the words appear suggests some other meaning."  *Nat'l Ass'n of Priv. Fund Managers v. Sec. & Exch. Comm'n*, 103 F.4th 1097, 1110 (5th Cir. 2024).  Therefore, the context in which Congress used the term "sex" in Title IX is relevant to this Court's determination of what Congress meant by that term at that time.[9]  Furthermore, it would be unworkable for courts to hold that "on the basis of sex" under Title IX has a different meaning in the context of Section 1557 regulations than it does in pure Title IX regulations.

For example, Title IX's regulations explicitly permit, and sometimes even require, consideration of sex.  These regulations protect (1) sex-education classes designated by sex, 34 C.F.R. § 106.34(a)(3); (2) comparable, "separate toilet, locker

---

[9] It is not necessary for the Court to determine whether all of Title IX was incorporated into Section 1557.  The May 2024 Rule recognizes that Section 1557 cites the entire statute, "20 U.S.C. 1681 et seq.," but the Office of Civil Rights views inclusion of "et seq." [as] simply part of an ordinary citation to the title IX statute."  89 Fed. Reg. 37,532.

room, and shower facilities on the basis of sex," *id.* § 106.33; (3) separate "physical education classes or activities during participation in . . . sports," *id.* § 106.34(a)(1); and (4) "separate [sports] teams for members of each sex," *id.* § 106.41(b).  The regulations further require schools to provide "equal athletic opportunity for members of both sexes," in "the selection of sports and levels of competition" for "both sexes."  *Id.* § 106.41(c).  "Thus, while an employer risks Title VII liability when it makes distinctions among employees based on sex, an education program risks Title IX liability *when it fails to distinguish* between student athletes based on sex."  *Soule v. Conn. Ass'n of Sch., Inc.*, 90 F.4th 34, 63 (2d Cir. 2023) (Menashi, J. concurring) (emphasis added).

In summary, the Court has found no basis for applying *Bostock*'s Title VII analysis to Section 1557's incorporation of Title IX.  HHS acted unreasonably when it relied on *Bostock*'s analysis in order to conflate the phrase "on the basis of sex" with the phrase "on the basis of gender identity."  Specifically, the *Bostock* holding did not "sweep beyond Title VII to other federal or state laws that prohibit sex discrimination."  *Bostock*, 590 U.S. at 681.  Interpreting the word "sex" to include gender identity would create contradictions and ambiguity within Title IX and its regulations.  And it is impossible to determine what Section 1557 meant by "the ground prohibited under . . . Title IX" without considering what type of discrimination was prohibited by Title IX.  Plaintiffs have demonstrated a substantial likelihood of success on the merits of their claim that HHS exceeded its statutory authority by applying the *Bostock* holding to Section 1557's incorporation

of Title IX in its May 2024 Rule.  "And to the extent that Congress and the
Executive Branch may disagree with how the courts have performed [their] job in a
particular case, they are of course always free to act by revising the statute."  *See
Loper Bright*, 2024 WL 3208360 at *17.

2.  <u>Substantial Threat of Irreparable Harm</u>

"An irreparable harm is one for which there is no adequate remedy at law."
*Book People, Inc. v. Wong*, 91 F.4th 318, 340 (5th Cir. 2024).  "If a plaintiff is an
object of a regulation 'there is ordinarily little question that the action or inaction
has caused him injury, and that a judgment preventing or requiring the action will
redress it.'"  *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 264 (5th
Cir. 2015) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).  The Fifth
Circuit has recognized that "complying with a regulation later held invalid almost
always produces the irreparable harm of nonrecoverable compliance costs. . . .  Such
harm, however, must be more than "speculative."  *Louisiana v. Biden*, 55 F.4th
1017, 1034 (5th Cir. 2022).  These compliance costs do not have to be quantified but
must only be more than de minimis.  *Id.* at 1035.

Plaintiffs argue they will suffer irreparable harm in the form of either
nonrecoverable compliance costs or the loss of federal funds without the Court's
immediate intervention.  (Pls.' Mem. at 23, ECF No. 21).  For example, Stephen
Smith, Director of the Division of TennCare, has testified that Tennessee's Medicaid
and CHIP programs do not provide coverage for gender-transition surgeries.  (Pls.'
Mot., Ex. A at 3, ECF No. 20-1).  Therefore, he explains that the May 2024 Rule

-23-

would cause Tennessee to endure an "administratively burdensome process" that
would take approximately nine months to complete in order to avoid losing
"significant federal funding." (*Id.*).  He concludes that "if Tennessee's Medicaid and
CoverKids programs were required to cover sex-transition surgeries, there would be
an immediate increase in state and federal expenditures." (*Id.* at 4).

Cody Smith testifies on behalf of the State of Mississippi that the Mississippi
Department of Medicaid is barred from providing coverage for gender transition
procedures for children under age eighteen.  (Pls.' Mot., Ex. B at 3, ECF No. 20-2).
He further explains that Mississippi Medicaid and CHIP programs do not cover
"operative procedures to treat a mental condition" or "cover services that are
cosmetic in nature." (*Id.* at 3).  He states that Mississippi would be required to
immediately expend resources in order to comply with the May 2024 Rule if it
requires coverage for treatment of mental conditions, cosmetic procedures, and
gender transition procedures for minors. (*Id.*).  Louisiana, Nebraska, Virginia,
Ohio, South Carolina, Alabama, and South Dakota have submitted similar
declarations describing the harm that the May 2024 Rule will cause them. (Pls.'
Mot., Ex. B-J, ECF Nos. 20-2 through 20-10).

HHS argues that Plaintiffs have not alleged imminent harm because they (1)
face no credible threat of imminent enforcement under the Rule, let alone injury in
fact, [and] (2) have failed to establish that their purported financial losses are

imminent and nonspeculative . . . ." (HHS Resp. at 22, ECF No. 24).[10]  However, as the Fifth Circuit has explained, Plaintiffs "are entitled to receive clarification from this court before stifling their constitutional practices or otherwise exposing themselves to punishment or enforcement action." *See Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 927-28 (5th Cir. 2023).

Also, Plaintiffs have submitted testimony that they will incur compliance costs when the May 2024 Rule goes into effect regardless of whether they are subjected to enforcement actions or lose federal funding.  These compliance costs provide sufficient basis for finding a substantial threat of irreparable harm.

> HHS further argues:

> [T]he *Neese* declaratory judgment undermines Plaintiffs' claims of standing and irreparable harm, because the Rule states that HHS "is not applying the challenged interpretation"— that is, that discrimination on the basis of sex in § 1557 includes discrimination on the basis of gender identity —"to members of the *Neese* class pending the appeal." 89 Fed. Reg. at 37,574 n.118.  Thus, because the *Neese* class includes all healthcare providers subject to § 1557, any potential future application of the Rule's interpretation that sex discrimination includes gender identity discrimination to a healthcare provider could occur only if the *Neese* judgment is overturned on appeal.  Any such potential future injury is not sufficiently "imminent," . . . to establish standing or imminent irreparable harm.

(HHS Mem. at 25, ECF No. 24).  HHS's argument is based on a footnote, which provides:

> In *Neese v. Becerra* . . . the U.S. District Court . . . held that [HHS] misapplied *Bostock* when it issued a public notice, 86 FR 27984 (May

---

[10] HHS also argues that Plaintiffs "lack standing to invoke the purported interests of their citizens."  (*Id.* at 22).  It is not necessary for the Court to address this argument because the Court has found that Plaintiffs themselves have established standing and a substantial threat of irreparable harm.

25, 2021), stating that it would interpret section 1557 and title IX's prohibition on sex discrimination to include discrimination on the basis of sexual orientation and gender identity. . . . The Department is not applying the challenged interpretation to members of the *Neese* class pending the appeal.

89 Fed. Reg. at 37,574 n.118.  In *Neese*, the court certified "a class of all healthcare providers subject to Section 1557 of the Affordable Care Act."  *Neese*, 342 F.R.D. 399, 405 (N.D. Tex. 2022); (*see also* HHS Resp., Ex. 1, ECF No. 24-1).  The court later entered a judgment declaring:

> (1) Plaintiffs and members of the certified class need not comply with the interpretation of "sex" discrimination adopted by Defendant Becerra in his Notification of Interpretation and Enforcement of May 10, 2021; and
> (2) Section 1557 of the ACA does not prohibit discrimination on account of sexual orientation and gender identity, and the interpretation of "sex" discrimination that the Supreme Court of the United States adopted in *Bostock v. Clayton County* . . . is inapplicable to the prohibitions on "sex" discrimination in Title IX of the Education Amendments and in Section 1557 of the ACA.

(HHS Resp., Ex. 2, ECF No. 24-2).  The *Neese* court denied the plaintiffs' request for injunctive relief.  (*Id.*).

Even if Plaintiffs are part of the *Neese* class, neither the *Neese* Judgment nor the footnote in the May 2024 Rule prevent Plaintiffs from establishing Article III standing or a substantial threat of irreparable harm.  The *Neese* Judgment was specifically tied to a general notice of policy issued by HHS, while the present lawsuit concerns a different final rule, which is much more detailed and extensive in scope.  Moreover, neither the *Neese* Judgment nor the footnote[11] explicitly relieve

---

[11] A vague footnote to a response to a comment to a proposed rule surely provides cold comfort to those regulated by the May 2024 Rule.  As the Fifth Circuit has

these Plaintiffs from compliance with the May 2024 Rule.  As a result, Plaintiffs have no assurance that they will be excused from incurring compliance costs when the May 2024 Rule goes into effect.  Plaintiffs therefore have established a substantial threat of imminent irreparable harm.

### 3.    Balance of Equities and Consideration of the Public Interest

The last two requirements that Plaintiffs must establish are "(3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Janvey*, 647 F.3d at 595.  "The balance-of-harms and public-interest factors merge when the government opposes an injunction." *Career Colleges & Schs. of Tex.*, 98 F.4th at 254.

A stay of the effective date of the May 2024 Rule will not harm either HHS or the public interest because it will merely preserve the status quo.  *See Louisiana v. Biden*, 55 F.4th at 1035.  Meanwhile, Plaintiffs have shown that they would either incur substantial costs in order to implement the May 2024 Rule's requirements or lose federal funding.  As a result, the Court finds that Plaintiffs have established all four elements for imposing a preliminary injunction and stay.

---

presumed, administrative agencies, "no less than Congress, do not 'hide elephants in mouseholes.'"  *Ryder v. Union Pac. R.R. Co.* , 945 F.3d 194, 203 (5th Cir. 2019) (quoting *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions — it does not, one might say, hide elephants in mouseholes.").

C.    The Proper Scope of the Injunction

1.    Stayed Regulations

The regulations for which Plaintiffs seek a stay are: 42 C.F.R. §§ 438.3, 438.206, 440.262, 460.98, 460.112; 45 C.F.R. §§ 92.5, 92.6, 92.7, 92.8, 92.9, 92.10, 92.101, 92.206-211, 92.301, 92.303, 92.304.  After careful review, the Court finds that the July 5, 2024, effective date should be stayed as to each of these regulations in so far as these regulations are intended to extend discrimination on the basis of sex to include discrimination on the basis of gender identity.  Defendants are also enjoined from enforcing, relying on, implementing, or otherwise acting pursuant to the May 2024 Rule's provisions concerning gender identity.

2.    Whether Relief Should be Restricted to Plaintiffs

"Nothing in the text of Section 705, nor of Section 706, suggests that either preliminary or ultimate relief under the APA needs to be limited to" the plaintiff. *Career Colleges & Schs. of Tex.*, 98 F.4th 220, 255 (5th Cir. 2024).  "Instead, . . . the scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action."  *Id.*  The court explained:

> The Department [of Education's] protests against nationwide relief are incoherent in light of its use of the Rule to prescribe uniform federal standards.  When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated — not that their application to the individual petitioners is proscribed.

*Id.* at 255.  The Court therefore finds that a nationwide stay of the effective date of the May 2024 Rule should be imposed.[12]

### D.   Necessity of a Bond

"The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  However, the court "may elect to require no security at all."  *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996).  Due to the strength of Plaintiffs' case as well as the lack of evidence that an injunction will cause HHS to suffer financial harm, the Court finds that Plaintiffs should not be required to post security.

## V.  CONCLUSION

A "statute cannot be divorced from the circumstances existing at the time it was passed, and from the evil which Congress sought to correct and prevent." *United States v. Champlin Ref. Co.*, 341 U.S. 290, 297 (1951).  "In all but the most unusual situations, a single use of a statutory phrase must have a fixed meaning. [Courts] therefore avoid interpretations that would attribute different meanings to the same phrase."  *Cochise Consultancy, Inc. v. U.S. ex rel. Hunt*, 587 U.S. 262, 268

---

[12] HHS cites the Fifth Circuit's refusal to affirm a universal injunction in *Braidwood Mgmt., Inc. v. Becerra*, No. 23-10326, 2024 WL 3079340 (5th Cir. June 21, 2024).  However, the *Braidwood* court determined that "there was no basis for a universal injunction because "there was no basis for the district court to grant relief under the APA."  *Id.* at *13.  The Fifth Circuit cited, and did not overrule, its published decision granting a nationwide stay two months earlier in *Career Colleges & Schs. of Tex.  See id.* (citing 98 F.4th at 255).

(2019).  Therefore, "it is never our job to rewrite . . . statutory text under the banner

of speculation about what Congress might have done."  *Garland v. Cargill*, No. 22-

976, 144 S. Ct. 1613, 1626 (2024) (holding that the ATF exceeded its statutory

authority when it issued a final rule providing that the word "machinegun" as it is

used in 26 U.S.C. § 5845(b), includes a "bump-stock-type device").

Consequently, this Court cannot accept the suggestion that Congress, with a

"clear voice," adopted an ambiguous or evolving definition of "sex" when it acted to

promote educational opportunities for women in 1972.  Title IX and its regulations

not only permit, but at times require, consideration of sex as well as separation on

the basis of sex.  *See* 20 U.S.C. § 1686 ("[N]othing contained herein shall be

construed to prohibit . . . separate living facilities for the different sexes."); 34 C.F.R.

§ 106.41(b),(c) (allowing funding recipients to maintain separate sports teams based

on sex, provided that the recipient offers equal athletic opportunity for members of

both sexes).  For all of the reasons noted above, the Court finds that Plaintiffs have

demonstrated that there is a substantial likelihood of success on the merits of their

claims and that they will suffer irreparable harm in the form of either compliance

costs or lost federal funding.  The substantial cost of compliance with the 181-page

rule weighs in favor of maintaining the status quo.  Therefore, Plaintiffs have

demonstrated that they are entitled to a nationwide preliminary injunction

prohibiting Defendants from enforcing HHS's May 2024 Rule.  Plaintiffs are also

entitled to a stay of the rule's July 5, 2024, effective date pursuant to 5 U.S.C. § 705.

**IT IS THEREFORE ORDERED AND ADJUDGED** that the [20] Urgent and Necessitous Motion for § 705 Relief, a Preliminary Injunction, and Expedited Relief filed by Plaintiffs is **GRANTED**.

**IT IS FURTHER ORDERED AND ADJUDGED** that the July 5, 2024, effective date of the final rule entitled Nondiscrimination in Health Programs and Activities, 89 Fed. Reg. 37,522 (May 6, 2024) is **STAYED** nationwide pursuant to 5 U.S.C. § 705, in so far as this final rule is intended to extend discrimination on the basis of sex to include discrimination on the basis of gender identity in the following regulations: 42 C.F.R. §§ 438.3, 438.206, 440.262, 460.98, 460.112; 45 C.F.R. §§ 92.5, 92.6, 92.7, 92.8, 92.9, 92.10, 92.101, 92.206-211, 92.301, 92.303, 92.304.

**IT IS FURTHER ORDERED AND ADJUDGED** that Defendants are **ENJOINED** nationwide from enforcing, relying on, implementing, or otherwise acting pursuant to the May 2024 Rule's provisions concerning gender identity.

**SO ORDERED AND ADJUDGED** this the 3rd day of July, 2024.

s/ *Louis Guirola, Jr.*

LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE