# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

**STATE OF TENNESSEE, et al.**                              **PLAINTIFFS**

**v.**                                        **CAUSE NO. 1:24cv161-LG-BWR**

**ROBERT F. KENNEDY, JR., in
his official capacity as
Secretary of the United States
Department of Health and
Human Services, et al.**                                      **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' CROSS-MOTION TO DISMISS

When it enacted the Patient Protection and Affordable Care Act, Congress gave the HHS Secretary authority to promulgate regulations prohibiting healthcare discrimination "on the ground prohibited under . . . [T]itle IX of the Education Amendments of 1972." 42 U.S.C. § 18116(a),(c) (citing 20 U.S.C. § 1681 et seq.). In the opinion of the Court, Congress only contemplated biological sex when it enacted Title IX in 1972. Therefore, the Court finds that HHS exceeded its authority by implementing regulations redefining sex discrimination and prohibiting gender-identity discrimination. *See* Dep't of Health & Human Servs., Nondiscrimination in Health Programs and Activities, 89 Fed. Reg. 37522 (May 6, 2024).

## BACKGROUND

In this lawsuit, fifteen states ask the Court to vacate portions of HHS's May

6, 2024, Final Rule and to grant a judgment declaring portions of the Rule invalid.[1]

The Rule amends 42 C.F.R. parts 438, 440, 457, and 460 and 45 C.F.R. parts 80, 84,

92, 147, 155, and 156.  *See* 89 Fed. Reg. at 37691.  Plaintiffs only challenge these

amendments to the extent they address gender-identity discrimination.[2]  For

example, the Rule provides:

> Discrimination on the basis of sex includes, but is not limited to,
> discrimination on the basis of:
> (i) Sex characteristics, including intersex traits;
> (ii) Pregnancy or related conditions;
> (iii) Sexual orientation;
> (iv) *Gender identity*; and
> (v) Sex stereotypes.

45 C.F.R. § 92.101(a)(2) (2024) (emphasis added). It also prohibits state-created

health benefit exchanges, recipients of Medicaid and Medicare, and others from

denying or limiting

> health services sought for purpose of gender transition or other gender-
> affirming care that the covered entity would provide to an individual
> for other purposes if the denial or limitation is based on an individual's
> sex assigned at birth, gender identity, or gender otherwise recorded.

45 C.F.R. § 92.206(b)(4) (2024); *see also* 45 C.F.R. § 92.4 (2024) (defining "covered

entity" to include health exchanges and recipients of federal financial assistance).

On July 3, 2024, the Court entered a [29] Memorandum Opinion and Order

---

[1] Plaintiffs originally requested injunctive relief, but they have abandoned that
request.  Pls.' Reply [70] at 14.

[2] In their Complaint, Plaintiffs also challenged HHS's decision to include "sexual
orientation" in its sex-discrimination definition.  Since they did not present
argument supporting this claim in their summary judgment submissions, the claim
is deemed abandoned.  *See Terry Black's Barbecue, L.L.C. v. State Auto. Mut. Ins.
Co.*, 22 F.4th 450, 459 (5th Cir. 2022).

granting a preliminary injunction that prohibited Defendants from enforcing, relying on, implementing, or otherwise acting pursuant to the Rule's provisions concerning gender-identity discrimination.  The Court also stayed the Rule's effective date insofar as "[the] rule [was] intended to extend discrimination on the basis of sex to include discrimination on the basis of gender identity in the following regulations: 42 C.F.R. §§ 438.3, 438.206, 440.262, 460.98, 460.112; 45 C.F.R. §§ 92.5, 92.6, 92.7, 92.8, 92.9, 92.10, 92.101, 92.206–92.211, 92.301, 92.303, 92.304."  Mem. Op. & Order [29] at 31.  Defendants appealed.

Soon afterwards, President Donald J. Trump issued two executive orders that directly conflict with HHS's Rule.  *See* Defending Women from Gender Ideology Extremism, Exec. Order 14,168, 90 Fed. Reg. 8615 (Jan. 20, 2025)[3]; Protecting Children from Chemical and Surgical Mutilation, Exec. Order 14,187, 90 Fed. Reg. 8771 (Jan. 28, 2025)[4].

After the 2025 change in administration and entry of these Orders, Defendants asked the Fifth Circuit to stay their appeal of the preliminary injunction so that the Trump administration could familiarize itself with the case and determine how it wished to proceed.  The parties eventually agreed to dismiss

---

[3] The Defending Women Executive Order provides, "It is the policy of the United States to recognize two sexes, male and female.  These sexes are not changeable and are grounded in fundamental and incontrovertible reality."  90 Fed. Reg. 8615. President Trump ordered the Attorney General to "immediately issue guidance to agencies to correct the misapplication of the Supreme Court's decision in [*Bostock v. Clayton County*] (2020) to sex-based distinctions in agency activities."  *Id.*
[4] In the Protecting Children Order, the executive order stated that the United States will not promote "the so-called 'transition' of a child from one sex to another." 90 Fed. Reg. 8771.

the appeal.  After the case returned to this Court, Plaintiffs filed a [61] Motion for

Summary Judgment, and Defendants filed a [68] Cross-Motion to Dismiss based on

the ripeness doctrine.

## DISCUSSION

## I.  RELEVANT AUTHORITY

Congress enacted Section 1557 of the Affordable Care Act in 2010.  It

prohibits discrimination "on the ground prohibited by [T]itle IX . . . under any

health program or activity, any part of which is receiving Federal financial

assistance . . . or under any program or activity that is administered by an

Executive Agency . . . ."  42 U.S.C. § 18116(a).  Since Section 1557 incorporates Title

IX by reference, it prohibits sex discrimination.  *See* 20 U.S.C. § 1681(a) ("No person

in the United States shall, on the basis of sex, be excluded from participation in, be

denied the benefits of, or be subjected to discrimination under any education

program or activity receiving Federal financial assistance . . . .") (emphasis added).

Congress granted the HHS Secretary authority to promulgate regulations

implementing this discrimination prohibition.  42 U.S.C. § 18116(c).  HHS

purported to exercise that authority when it issued the Rule challenged in this case.

HHS relied on the Supreme Court's reasoning in *Bostock v. Clayton County*,

590 U.S. 644 (2020), when it authored and proposed the Rule.  *See*

Nondiscrimination in Health Programs and Activities, 87 Fed. Reg. 47824-01, 47858

(proposed Aug. 4, 2022); s*ee also* 89 Fed. Reg. 37573, 37685.  In *Bostock*, the

Supreme Court held that an employer who fires a person for being homosexual or

transgender violates Title VII because, in that circumstance, the termination is "for traits or actions [the employer] would not have questioned in members of a different sex." 590 U.S. at 651. Although the *Bostock* Court assumed that the word "sex" in Title VII referred to the biological distinctions between male and female, it held, "For an employer to discriminate against employees for being homosexual or transgender, the employer must intentionally discriminate against individual men and women in part because of sex." *Id.* at 655, 662.

## II.  DEFENDANTS' CROSS-MOTION TO DISMISS

Article III of the Constitution restricts federal courts' jurisdiction to "cases" and "controversies." U.S. Const. art. III, § 2. "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citation modified). Standing is established when a plaintiff files its complaint. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008). As a result, recent developments do not require the Court to reconsider its prior determination that Plaintiffs have standing. *See* Mem. Op. & Order [29] at 9–10.

In their Motion to Dismiss, Defendants claim this lawsuit is not ripe. The ripeness doctrine, which also arises under Article III, prohibits premature or speculative lawsuits from proceeding. *Lower Colo. River Auth. v. Papalote Creek II, L.L.C.*, 858 F.3d 916, 922 (5th Cir. 2017).

> In general terms, standing is concerned with whether a proper party is bringing suit, while ripeness is concerned with whether the suit is being brought at the proper time. However, the doctrines often overlap in practice, particularly in an examination of whether a plaintiff has

suffered a concrete injury, and our injury-in-fact analysis draws on
precedent for both doctrines.

*Texas v. United States*, 497 F.3d 491, 496 (5th Cir. 2007) (citation modified).  The

ripeness doctrine's "basic rationale is to prevent the courts, through premature

adjudication, from entangling themselves in abstract disagreements."  *Thomas v.*

*Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985) (quoting *Abbott Labs. v.*

*Gardner*, 387 U.S. 136, 148 (1967)).  To determine whether a case is ripe, the court

must balance "(1) the fitness of the issues for judicial decision, and (2) the hardship

to the parties of withholding court consideration."  *Texas*, 497 F.3d at 498.  The

fitness-for-decision element is satisfied if:

> (1) the questions presented are purely legal ones, (2) the challenged
> regulations constitute final agency action, and (3) further factual
> development would not significantly advance the court's ability to deal
> with the legal issues presented.  An additional consideration is
> whether resolution of the issues will foster effective administration of
> the statute.

*Id.* at 498–99 (citation modified).  As for the second ripeness element,

> the Supreme Court has found hardship to inhere in legal harms, such
> as the harmful creation of legal rights or obligations; practical harms
> on the interests advanced by the party seeking relief; and the harm of
> being forced to modify one's behavior in order to avoid future adverse
> consequences.

*Id.* at 499 (citation modified); *see also Abbott Labs.*, 387 U.S. at 152 (holding that

the hardship requirement is satisfied when administrative regulations force

plaintiffs to either incur significant costs by complying with the regulations or risk

prosecution by failing to comply).

Here, the question whether HHS exceeded its statutory authority is a pure

question of law.  Additional fact-finding is unnecessary.  Furthermore, the Rule is fit for judicial review because it constitutes a final rule promulgated through the formal, notice-and-comment process after announcement in the *Federal Register*. *See Texas*, 497 F.3d at 499.  Finally, resolution of this question, which has plagued HHS and the parties it regulates for nearly a decade, would provide much-needed clarity to the parties, the public, the executive branch, and Congress.  *See* Mem. Op. & Order [29] at 6–9 (discussing prior Rules, Executive Orders, notices, and guidance that HHS implemented while attempting to address this issue).

Defendants argue that the hardship element of ripeness is not satisfied because "Plaintiffs cannot credibly assert, in spite of the President's executive orders, that they face any threat of compliance costs or loss of federal funds under the Rule."  Defs.' Mem. [67] at 8.  This argument is by no means persuasive.

The Defending Women Executive Order requires Defendants to "*remove all . . . regulations . . . that promote or otherwise inculcate gender ideology.*"  90 Fed. Reg. 8615 (emphasis added).  And the Protecting Children Executive Order requires agencies to "take all appropriate actions *to end* the chemical and surgical mutilation of children, *including regulatory and sub-regulatory actions, which may involve . . . section 1557 of the Patient Protection and Affordable Care Act.*"  90 Fed. Reg. 8771 (emphasis added).  Defendants have not delineated any efforts they have made to comply with the President's directives to "remove" or "end" the conflicting portions of the Rule.  They merely state, "In light of the change in Administration, the Rule remains under consideration at HHS."  *See* Defs.' Mem. [67] at 1.  Defendants have

not provided any notice, guidance, affidavit, or evidence describing the nature of this "consideration" or providing any assurances that gender-identity provisions in the Rule will not be enforced.

More importantly, HHS cannot reconsider a final rule unless it complies with the requirements of the Administrative Procedure Act (APA), including notice and comment. *See Clean Air Council v. Pruitt*, 862 F.3d 1, 8 (D.C. Cir. 2017) (citing 5 U.S.C. § 553). The APA "mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015); *see also* 5 U.S.C. § 551(5) (defining "rule making" as the "agency process for formulating, amending, or repealing a rule"). Furthermore, "an agency issuing a legislative rule is itself bound by the rule until that rule is amended or revoked." *Nat'l Fam. Planning & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 234 (D.C. Cir. 1992); *see also United States v. Nixon*, 418 U.S. 683, 696 (1974) ("So long as this regulation is extant it has the force of law.").

Therefore, Defendants do not possess the authority to repeal or amend the Rule without conducting rulemaking, which includes notice and comment. It is even questionable whether Defendants have authority to postpone enforcement of the Rule.[5] *See Pruitt*, 862 F.3d at 9 (holding that an agency must have statutory

---

[5] The only APA-authorized manner of postponing enforcement of a rule is set forth at 5 U.S.C. § 705. Of course, Section 705 would not apply if the Court dismisses the case as requested by Defendants.

authority to stay enforcement of a final rule); *also Clean Water Action v. U.S. Env't Prot. Agency*, 936 F.3d 308, 314 n.11 (5th Cir. 2019) ("Intentionally delaying implementation of a duly promulgated rule may be analogous to an agency's issuing a rule that is inconsistent with a prior rule.").

Furthermore, some of Defendants' arguments and actions in this case indicate that they are considering preserving at least some of the gender-identity provisions in the Rule. For example, Defendants continue to argue that the Rule should not be subjected to judicial review unless or until HHS begins an enforcement action against Plaintiffs. They further argue that the Rule's gender-identity provisions should not be vacated; they seek to limit the scope of any vacatur; and they oppose entry of a declaratory judgment.

If Defendants intended to comply with the President's Executive Orders, they could have filed a motion for voluntary remand so that HHS could rescind or amend the Rule. *See Citizens Against Pellissippi Parkway Extension, Inc. v. Mineta*, 375 F.3d 412, 416–17 (6th Cir. 2004) ("Courts typically grant an agency's motion to remand a case if there has been an intervening change in the law or new evidence.") (citation modified); *Broussard v. U.S. Postal Serv.*, 674 F.2d 1103, 1108 n.4 (5th Cir. 1982) ("Once a judicial suit is filed, an agency should not unilaterally reopen administrative proceedings—the agency should first ask the court to remand the case to it.") (citation modified). Since the Rule has not yet gone into effect, Defendants also could have filed a motion for a stay pursuant to 5 U.S.C. § 705 so

that they could rescind the Rule,[6] or they could have changed their position in this case due to the Executive Orders, but they chose not to do so.  *See* Hickman & Pierce, *Administrative Law Treatise* § 20.4 (Supplement 2025) (explaining the measures a new presidential administration can take when it disagrees with a prior administration's final rule).

If this Court were to grant Defendants' Motion, the preliminary injunction would be automatically dissolved.  *See Su v. Ascent Constr., Inc.*, 104 F.4th 1240, 1246 (10th Cir. 2024).  Consequently, Plaintiffs would be without protection from and be required to immediately comply with the Rule.  *See Abbott Labs.*, 387 U.S. at 152.  Defendants would no longer be enjoined from enforcing the Rule, and private citizens would be permitted to initiate civil proceedings against Plaintiffs for gender-identity discrimination.  *See Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 218 (2022) (noting that Title IX and the ACA grant discrimination victims a private right of action against covered entities).

Plaintiffs' claims are not premature, abstract, or contingent.  The promise of HHS "consideration" offers little comfort or protection from, as noted below, an overreach of executive authority.  The Rule is in place, and the threat of enforcement and legal action is real.  Therefore, this lawsuit is ripe for a decision.  Defendants' Cross-Motion to Dismiss is denied.

---

[6] After voluntarily dismissing their appeal, Defendants filed a [59] Notice requesting an extension of the stay that had been entered pending the conclusion of the appeal.  The Court struck the Notice and informed Defendants they must file a motion to obtain relief.  *See* L.U. Civ. R. 7(b).

## III.  PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs claim the Rule exceeds HHS's statutory authority because (1) it provides that sex discrimination includes gender-identity discrimination, and (2) it unlawfully regulates the practice of medicine.  *See* 5 U.S.C. § 706(2)(C).  Plaintiffs further assert that the Rule is arbitrary and capricious.  *See* 5 U.S.C. § 706(2)(A).  Since the Court finds that HHS exceeded its authority by expanding sex discrimination to include gender-identity discrimination, the Court does not need to address Plaintiffs' alternative arguments.

### A.  WHETHER THE RULE EXCEEDS THE AUTHORITY GRANTED TO HHS BY CONGRESS

"An agency's promulgation of rules without valid statutory authority implicates core notions of the separation of powers, and [courts] are required by Congress to set these regulations aside."  *U.S. ex rel. O'Keefe v. McDonnell Douglas Corp.*, 132 F.3d 1252, 1257 (8th Cir. 1998) (citing 5 U.S.C. § 706(2)(C) ("The reviewing court shall. . . hold unlawful and set aside agency action, findings, and conclusions found to be. . . in excess of statutory. . . authority.")).

> Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires.  Careful attention to the judgment of the Executive Branch may help inform that inquiry.  And when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it.  But courts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous.

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).

Statutes "have a single, best meaning," which "is fixed at the time of

enactment." *Id.* at 401.  Courts must "avoid interpretations that would attribute different meanings to the same phrase." *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 268 (2019) (citation modified).  "The appropriate starting point when interpreting any statute is its plain meaning." *Inhance Techs., L.L.C. v. U.S. Env't Prot. Agency*, 96 F.4th 888, 893 (5th Cir. 2024).  To determine a statute's plain meaning, courts must "look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *Id.*  "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).  Courts "often look to dictionary definitions for help in discerning a word's ordinary meaning." *Cascabel Cattle Co. v. United States*, 955 F.3d 445, 451 (5th Cir. 2020).

Here, HHS has conceded that "Title IX prohibits discrimination on the basis of sex, so the 'ground prohibited' under that statute is sex."  89 Fed. Reg. 37522-01, 37532; *see also Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 371 (5th Cir. 2022) ("Section 1557 incorporates Title IX's definition of prohibited sex discrimination.").

The word "sex" is not defined in Title IX, so the Court must interpret the term according to its meaning in or around 1972, when the statute was enacted. *See Wisc. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018).  In the 1960s and 1970s, *Black's Law Dictionary* defined "sex" as "[t]he sum of the peculiarities of structure and function that distinguish a male from a female organism; the character of being male or female." *Sex, Black's Law Dictionary* (4th rev. ed. 1968);

*see also Sex*, *Black's Law Dictionary* (5th ed. 1979).  In 1971, *Webster's Dictionary*

defined "sex" as "one of the two divisions of organic[,] esp[ecially] human[,] beings

respectively designated male or female" or:

> the sum of the morphological, physiological, and behavioral
> peculiarities of living beings that subserves biparental reproduction
> with its concomitant genetic segregation and recombination which
> underlie most evolutionary change, that in its typical dichotomous
> occurrence is us[ually] genetically controlled and associated with
> special sex chromosomes, and that is typically manifested as maleness
> and femaleness with one or the other of these being present in most
> higher animals.

*Sex*, *Webster's 3d New Int'l Dictionary* (1971).  Just after Title IX was enacted, the

editors of *Webster's Dictionary* shortened the definition of "sex," but continued to

focus on the reproductive distinctions between males and females:

> 1: either of two divisions of organisms distinguished respectively as
> male or female[;] 2: the sum of the structural, functional, and
> behavioral characteristics of living beings that subserve reproduction
> by two interacting parents and that distinguish males and females.

*See Sex*, *Webster's New Collegiate Dictionary* (1973).  As a result, the term "sex"

generally referred to biological sex when Congress enacted Title IX.

Next, the Court must attempt to determine the meaning of "gender identity,"

as it is used in the Rule.  HHS did not amend Part 45 of the C.F.R. to define "gender

identity," when it issued the Rule.  *See* 45 C.F.R. § 92.4.  In the Rule's preamble,

HHS states that the term "'gender identity' necessarily encompasses 'transgender

status' and these terms are often used interchangeably." 89 Fed. Reg. 37556.  It

declined to define "gender identity" or "transgender status" because "individuals use

various terminology to describe their gender identity." *Id.* at 37577.  It stated that

it would

> investigate discrimination against an individual based on having a
> gender identity that is *different from their sex assigned at birth* as
> discrimination on the basis of gender identity, regardless of whether
> the individual identifies with or uses the term "transgender" or
> another identity.

*Id.* (emphasis added).

In contrast, HHS recognized "that sex has *biological components*[,] and

knowledge of an individual's biological attributes is an essential component of

providing high quality health care for all patients."  *Id.* at 37575 (emphasis added).

HHS further explained:

> [I]t is not necessary to define "sex" in this rule, as we have addressed a
> non-exhaustive list of what constitutes discrimination on the basis of
> sex at § 92.101(a)(2).  The Supreme Court did not define the term "sex"
> in [*Bostock*], but rather noted that nothing in their approach to the
> cases considered turned on the debate over whether "sex" was limited
> to "biological distinctions between male and female," and the Court
> therefore proceeded on the assumption that "sex" carried that
> meaning.

*Id.* Thus, HHS correctly recognized a distinction between "sex" and "gender

identity" when it issued the Rule.  *See Gender Identity*, *Oxford English Dictionary*

(July 2023) ("Gender identity is generally regarded as distinct from biological sex, or

sex as registered at birth.").

Now that the Court has determined that the word "sex" used in Title IX and

the phrase "gender identity" used in the Rule are not synonymous, the Court must

address HHS's position that the *Bostock* Court's analysis of Title VII sex

discrimination should be applied to Title IX sex discrimination.  When it proposed

the Rule, HHS explained:

> In [*Bostock*], the Supreme Court held that the prohibition on discrimination "because of . . . sex" under Title VII covers discrimination on the basis of gender identity . . . even assuming that "sex" refers only to biological distinctions between male and female. Title IX and Section 1557 prohibit discrimination "on the basis of sex." Because their statutory prohibitions against sex discrimination are similar, the Supreme Court and other Federal courts consistently look to interpretations of Title VII to inform Title IX. Thus, [*Bostock*'s] discussion of the text of Title VII informs the Department's analysis of Title IX and Section 1557.

87 Fed. Reg. 47824-01, 47858 (citation modified) (citing *Bostock*, 590 U.S. at 665; 20 U.S.C. § 1681(a); 42 U.S.C. § 18116).

In *Bostock*, the Supreme Court held that "Title VII's 'because of [sex]' test incorporates the simple and traditional standard of but-for causation." 590 U.S. at 656 (citation modified). "That form of causation is established whenever a particular outcome would not have happened 'but for' the purported cause." *Id.* Therefore, the Supreme Court determined:

> An employer violates Title VII when it intentionally fires an individual employee based in part on sex. It doesn't matter if other factors besides the plaintiff's sex contributed to the decision. And it doesn't matter if the employer treated women as a group the same when compared to men as a group. If the employer intentionally relies in part on an individual employee's sex when deciding to discharge the employee—put differently, if changing the employee's sex would have yielded a different choice by the employer—a statutory violation has occurred.

*Id.* at 659–60. The Court provided examples to illustrate its reasoning. "If the employer fires the male employee for no reason other than the fact he is attracted to men, the employer discriminates against him for traits or actions it tolerates in his female colleague." *Id.* at 660. As for transgender employees, "[i]f the employer retains an otherwise identical employee who was identified as female at birth, the

employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Id.*

In both circumstances, the Court found that "the individual employee's sex plays an unmistakable and impermissible role in the discharge decision." *Id.* Importantly, the *Bostock* Court noted that it did not purport to address other statutes that prohibit sex discrimination, and it limited its holding to the question of "whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex.'" *Id.* at 681.

Recently, the Supreme Court discussed *Bostock* while considering whether a Tennessee statute banning "gender-affirming care" for transgender minors violates the Equal Protection Clause of the Fourteenth Amendment. *United States v. Skrmetti*, 145 S. Ct. 1816, 1834–35, 222 L. Ed. 2d 136 (2025). The Court provided the following hypothetical to demonstrate that *Bostock* was distinguishable:

> Consider [a] minor girl with unwanted facial hair inconsistent with her sex. If she has a diagnosis of hirsutism (male-pattern hair growth), a healthcare provider may, consistent with [the statute], prescribe her puberty blockers or hormones. But changing the minor's sex to male does not automatically change the operation of [the statute]. If hirsutism is replaced with gender dysphoria, the now-male minor may not receive puberty blockers or hormones; but if hirsutism is replaced with precocious puberty, [the statute] does not bar either treatment. Unlike the homosexual male employee whose sexuality automatically switches to straight when his sex is changed from male to female, there is no reason why a female minor's diagnosis of hirsutism automatically changes to gender dysphoria when her sex is changed from female to male. Under the logic of *Bostock*, then, sex is simply not a but-for cause of [the statute's] operation.

*Id.* at 1835 (citation modified).

The *Skrmetti* decision is instructive here because the Rule requires healthcare providers to provide "gender-affirming care that the covered entity would provide to an individual for other purposes if the denial or limitation is based on an individual's sex assigned at birth, gender identity, or gender otherwise recorded." *See* 45 C.F.R. § 92.206(b)(4) (2024). In the present case, as in *Skrmetti*, the medical diagnosis is the but-for cause of the denial of healthcare. For example, the Rule generally prohibits a medical provider who performs mastectomies on persons diagnosed with breast cancer or a BCRA1 or BCRA2 gene mutation[7] from refusing to perform mastectomies on persons seeking a mastectomy due to gender dysphoria.[8] The provider's refusal in this circumstance is not based on sex; it is based on the patient's cancer-related diagnosis, or lack thereof.[9]

---

[7] "Breast cancer genes BRCA1 and BRCA2 are tumor suppressor genes whose mutations significantly increase the likelihood of developing particular types of epithelial malignancies, namely breast and ovarian cancer." Jesse T. Casaubon, Sarang Kashyap & John-Paul Regan, *BCRA1 and BCRA2 Mutations*, National Library of Medicine, https://www.ncbi.nlm.nih.gov/ books/NBK470239/ (last visited Oct. 6, 2025). "The management of patients with a BRCA1 and BRCA2 gene mutations is individualized and can include . . . bilateral prophylactic mastectomy." *Id.*

[8] The Court recognizes that the Rule allows a medical provider to refuse to perform a mastectomy on a person with gender dysphoria due to health issues that make the procedure too dangerous. *See* 45 C.F.R. § 92.206(c) (2024). That possibility is not relevant to the issue currently before the Court.

[9] "Although breast cancer is typically synonymous as a disease that commonly occurs in women, it does occur in men as well." Ahmed Khattab, Sarang Kashyap & Dulabh K. Monga, *Male Breast Cancer*, National Library of Medicine, https://www.ncbi.nlm.nih.gov/books/NBK526036/ (last visited Oct. 6, 2025). Of course, if a provider performed mastectomies on women suffering from breast cancer but refused to perform the procedure on men suffering from breast cancer, sex would be

Furthermore, as the Eleventh Circuit has recognized, the *Bostock* decision is distinguishable because "Title IX, unlike Title VII, includes express statutory and regulatory carve-outs for differentiating between the sexes when it comes to separate living and bathroom facilities, among others." *Adams*, 57 F.4th at 811. If "sex" referred to "gender identity," these carve-outs "would be rendered meaningless" whenever they came "into conflict with a transgender person's gender identity." *Id.* at 813. The *Adams* court reasoned:

> But reading "sex" to include "gender identity" . . . would result in situations where an entity would be prohibited from installing or enforcing the otherwise permissible sex-based carve-outs when the carve-outs come into conflict with a transgender person's gender identity. Such a reading would thereby establish dual protection under Title IX based on both sex and gender identity when gender identity does not match sex.

*Id.* at 814.

For example, Title IX provides, "Notwithstanding anything to the contrary contained in this chapter, nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. Also, Title IX's regulations protect (1) sex-education classes designated by sex, 34 C.F.R. § 106.34(a)(3); (2) comparable, "separate toilet, locker room, and shower facilities on the basis of sex," § 106.33; (3) separate "physical education classes or activities during participation" in contact sports, § 106.34(a)(1); and (4) "separate [sports]

---

the basis for the refusal under Section 1557. The HHS Rule goes far beyond that situation.

teams for members of each sex," § 106.41(b).  Thus, while Title VII provides that "[a]n individual employee's sex is not relevant to the selection, evaluation, or compensation of employees," *Bostock*, 590 U.S. at 660, Title IX and its regulations allow educational programs to separate students based on sex.  *See Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 728 (1982) ("In limited circumstances, a gender-based classification favoring one sex can be justified if it intentionally and directly assists members of the sex that is disproportionately burdened.").

"Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities, which was documented in hearings held in 1970 by the House Special Subcommittee on Education." *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286 (2d Cir. 2004).  HHS exceeded the scope of its statutory authority when it expanded the Title IX phrase "on the basis of sex" to include "discrimination on the basis of gender identity."  Furthermore, the *Bostock* Court's Title VII analysis does not support a finding that denial of healthcare based on gender identity necessarily constitutes sex discrimination.  Plaintiffs are therefore entitled to summary judgment.

## B.  WHETHER VACATUR IS AN APPROPRIATE REMEDY

In their Motion for Summary Judgment, Plaintiffs ask the Court to "vacate the offending portions of the 2024 Rule."  Pls.' Mot. [61] at 3.  The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations."  5

U.S.C. § 706(2)(C).  As such, the APA "empowers courts to set aside—i.e., formally nullify and revoke—an unlawful agency action.'" *Tex. Corn Producers v. U.S. Env't Prot. Agency*, 141 F.4th 687, 710 (5th Cir. 2025) (citation modified).

Under Fifth Circuit precedent, vacatur is the appropriate remedy except in "rare cases satisfying two conditions." *Id.*

> *First*, there must be a serious possibility that the agency will be able to correct the rule's defects on remand.  Remand without vacatur is therefore inappropriate for agency action suffering from one or more serious procedural or substantive deficiencies.  *Second*, vacating the challenged action would produce disruptive consequences.

*Id.*  "To satisfy the first condition, there must be a serious possibility that the agency can substantiate its decision given an opportunity to do so."  *Id.*

Here, Defendants argue that vacatur is not the appropriate remedy, but they have not argued that either of these conditions applies.  Specifically, they have not explained how they would or could correct the Rule on remand.  *See Nat'l Ass'n of Priv. Fund Managers v. Sec. & Exch. Comm'n*, 151 F.4th 252, 273 (5th Cir. 2025) (Denial of vacatur "is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so.") (citation modified); *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 120 F.4th 163, 177 (5th Cir. 2024) (requiring vacatur where a rule "suffers from a fundamental substantive defect" that could not be corrected on remand).

As for the second condition, vacatur will not cause disruption because the Rule has not yet gone into effect.  Vacatur is therefore the appropriate remedy under Fifth Circuit precedent.

### C. Whether Universal Vacatur is Appropriate

Defendants argue that vacatur should be limited to the parties, but Plaintiffs seek universal vacatur. The Fifth Circuit has held that the APA does not limit the scope of vacatur to the parties. *Career Colls. & Sch. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024);[10] *Tex. Med. Ass'n v. U.S. Dep't Health & Hum. Servs.*, 110 F.4th 762, 779–80 (5th Cir. 2024) (explaining that universal vacatur is "statutorily permissible and required" in the Fifth Circuit) (citation modified). As a result, "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Career Colls.*, 98 F.4th at 255; *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 832 (2024) (Kavanaugh, J., concurring) (explaining that the APA allows universal vacatur); *but see United States v. Texas*, 599 U.S. 670, 693 (2023) (Gorsuch, J., concurring) (opining that the APA does not allow vacatur).

The Rule exceeds HHS's statutory authority. It is intended to regulate numerous healthcare providers throughout the United States. In the Court's view, universal vacatur is the appropriate remedy in this circumstance. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 913 (1990) (Blackmun, J., dissenting) (explaining that vacatur affecting rights of parties not before the court is appropriate for invalid

---

[10] The Supreme Court granted certiorari on other grounds in *Dep't of Educ. v. Career Colleges & Sch. of Tex.*, 145 S. Ct. 1039, 220 L. Ed. 2d 375 (2025). The appeal was later dismissed.

"rule[s] of broad applicability").[11]

### D. WHETHER VACATUR SHOULD BE LIMITED TO CERTAIN PROVISIONS

The Rule contains a severability provision, 45 C.F.R. § 92.2(c) (2024), and the parties agree that the portions of the Rule that exceed HHS's statutory authority can be severed from the remainder of the Rule. However, the parties disagree over which portions of the Rule exceed HHS's statutory authority.

Plaintiffs seek vacatur of the following provisions of the Rule:

> 42 C.F.R. §§ 438.3, 438.206, 440.262, 460.98, 460.112; 45 C.F.R. §§ 92.5, 92.6, 92.7, 92.8, 92.9, 92.10, 92.101, 92.206-211, 92.301, 92.303, 92.304; and any other provision of the 2024 Rule applied with respect to "sex" discrimination that encompasses gender identity[.]

Pls.' Summ. J. Mem. [62] at 16 (citing Pls.' Prelim. Inj. Mot. [20]; Prelim. Inj. Order [30]). Defendants argue:

> [T]he Court should limit any vacatur to those provisions, or portions of the Rule, that address the administration of sex-segregated spaces or the provision of or coverage for gender-affirming care. Thus, any vacatur should be limited to 45 C.F.R. §§ 92.101(a)(2)(iv), 92.206(b)(1)–(4), 92.207(b)(3)–(5); 42 C.F.R. §§ 438.3(d)(4), 438.206(c)(2), 440.262, 460.98(b)(3), 460.112(a)—and only to the extent these provisions are "intended to extend discrimination on the basis of sex to include discrimination on the basis of gender identity."

Defs.' Resp. Mem. [67] at 13.

The Court agrees that vacatur is not necessary for regulations that do not discuss gender identity or specifically cite regulations related to gender identity.

---

[11] Although Justice Blackmun was writing in dissent, he was "apparently expressing the view of all nine Justices on this question." *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (citing *Lujan*, 497 U.S. at 890 n.2 (majority opinion)).

However, the Court finds that 45 C.F.R. § 92.8(b)(1), 45 C.F.R. § 92.10(a)(1)(i), and 45 C.F.R. § 92.208 should be vacated because they specifically cite HHS's definition containing "gender identity." *See* 45 C.F.R. § 92.8(b)(1) (2024) (requiring each covered entity to implement a written policy that states it "does not discriminate on the basis of . . . *sex (consistent with the scope of sex discrimination described at § 92.101(a)(2)) . . .* ") (emphasis added); 45 C.F.R. § 92.10(a)(1)(i) (2024) (requiring a covered entity to provide a notice stating that it does not discriminate on the basis of . . . *sex (consistent with the scope of sex discrimination described at § 92.101(a)(2)) . . .* ") (emphasis added); 45 C.F.R. § 92.208 (2024) ("[A] covered entity must not take an individual's sex, *as defined in § 92.101(a)(2)*, into account in applying any rule concerning an individual's current, perceived, potential, or past marital, parental, or family status.") (emphasis added).

In summary, the Court finds that the following regulations should be vacated to the extent that they expand Title IX's definition of sex discrimination to include gender-identity discrimination: 42 C.F.R. § 438.3(d)(4), 42 C.F.R. § 438.206(c)(2), 42 C.F.R. § 440.262, 42 C.F.R. § 460.98(b)(3), 42 C.F.R. § 460.112(a), 45 C.F.R. § 92.101(a)(2)(iv), 45 C.F.R. § 92.206(b)(1)–(4), 45 C.F.R. § 92.207(b)(3)–(5), 45 C.F.R. § 92.8(b)(1), 45 C.F.R. § 92.10(a)(1)(i), and 45 C.F.R. § 92.208.

### E.  WHETHER DECLARATORY RELIEF IS AN APPROPRIATE REMEDY

Plaintiffs "seek declaratory relief confirming their right to run programs under the proper reading of Section 1557 that does not conflate 'sex' with gender identity."  Pls.' Mot. [61] at 2.  The APA provides, "The form of proceeding for

judicial review . . . includ[es] actions for declaratory judgments . . . ." 5 U.S.C.

§ 703. In addition, the Declaratory Judgment Act states that federal courts "may

declare the rights and other legal relations of any interested party seeking such

declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

"Any such declaration shall have the force and effect of a final judgment or decree

and shall be reviewable as such." *Id.*

The question of whether to grant a declaratory judgment is a matter of

discretion, vested with the district court. *Odeco Oil & Gas Co., Drilling Div. v.*

*Bonnette*, 4 F.3d 401, 404 (5th Cir. 1993). "The existence of another adequate

remedy does not preclude a declaratory judgment that is otherwise appropriate."

Fed. R. Civ. P. 57; *see also* 33 Wright & Miller's Federal Practice and Procedure

§ 8385 (2d ed. Sept. 2025) ("Unlike injunctive relief, declaratory relief does not

require the absence of alternative remedies.").

In their Complaint, Plaintiffs ask the Court to enter the following

declarations:

> (i) the Final Rule's gender-identity mandates are unlawful; (ii) the
> Final Rule is arbitrary and capricious; and (iii) the Plaintiff States,
> their political subdivisions, and their resident healthcare providers
> may continue receiving federal financial assistance notwithstanding
> any failure to adhere to the 2024 Rule's unlawful requirements.

Compl. [1] at 78.[12] The Court has not reached the question of whether the Rule is

---

[12] Plaintiffs requested additional, more detailed declarations in a proposed final
judgment they emailed to the Court. Since those proposed declarations were not
included in Plaintiffs' Complaint, Motion for Summary Judgment, or Summary
Judgment Memorandum, the Court finds that Plaintiffs have not demonstrated
they are entitled to those declarations.

arbitrary and capricious, and Plaintiffs' proposed declaration related to federal financial assistance is overly broad. The Court will grant the following declaratory judgment for the reasons previously stated: HHS exceeded its statutory authority when (1) it interpreted Title IX, as incorporated into Section 1557, to prohibit discrimination based on gender identity, and (2) when it implemented Section 1557 regulations concerning gender identity and "gender affirming care."

## CONCLUSION

A "statute cannot be divorced from the circumstances existing at the time it was passed, and from the evil which Congress sought to correct and prevent." *United States v. Champlin Ref. Co.*, 341 U.S. 290, 297 (1951). When it enacted Title IX, Congress's concern was prohibiting sex discrimination in education. It was particularly concerned with inequality that female students experienced. It did not at that time contemplate gender identity, transgender status, or "gender-affirming care."

Because Title IX and its regulations permit consideration of sex as well as separation based on sex, as noted above, the *Bostock* Court's Title VII analysis cannot reasonably be applied to Title IX. Also, the refusal to provide procedures or medications for gender transition is not sex discrimination under the *Bostock* Court's reasoning.

"Agencies do not have unlimited power to accomplish their policy preferences until Congress stops them; they have only the powers that Congress grants through a textual commitment of authority." *Ryan LLC v. Fed. Trade Comm'n*, 739 F. Supp.

3d 496, 514 (N.D. Tex. 2024).  Neither Defendants nor this Court have authority to reinterpret or expand the meaning of "sex" under Title IX.

**IT IS THEREFORE ORDERED AND ADJUDGED** that Plaintiffs' [61] Motion for Summary Judgment is **GRANTED**.  The Court will enter a separate judgment as required by Fed. R. Civ. P. 58(a).

**IT IS FURTHER ORDERED AND ADJUDGED** that the following regulations are **VACATED** to the extent that they expand Title IX's definition of sex discrimination to include gender-identity discrimination: 42 C.F.R. § 438.3(d)(4), 42 C.F.R. § 438.206(c)(2), 42 C.F.R. § 440.262, 42 C.F.R. § 460.98(b)(3), 42 C.F.R. § 460.112(a), 45 C.F.R. § 92.101(a)(2)(iv), 45 C.F.R. § 92.206(b)(1)–(4), 45 C.F.R. § 92.207(b)(3)–(5), 45 C.F.R. § 92.8(b)(1), 45 C.F.R. § 92.10(a)(1)(i), and 45 C.F.R. § 92.208.

**IT IS FURTHER ORDERED AND ADJUDGED** that Plaintiffs are entitled to the following declaratory judgment: HHS exceeded its statutory authority when (1) it interpreted Title IX, as incorporated into Section 1557, to prohibit discrimination on the basis of gender identity, and (2) when it implemented Section 1557 regulations concerning gender identity and "gender affirming care."

**IT IS FURTHER ORDERED AND ADJUDGED** that Defendants' [68] Cross-Motion to Dismiss is **DENIED**.

**SO ORDERED AND ADJUDGED** this the 22nd day of October, 2025.

s/ *Louis Guirola, Jr.*

LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE